**GREAT LAKES CARBON CORPORATION, Plaintiff,**

v.

**KOCH INDUSTRIES, INC., Koch Carbon, Inc. and E. Thomas Fish, Defendants.**

**No. 80 CIV. 4577(MP).**

United States District Court, S. D. New York.

Sept. 18, 1980.

Ostrolenk, Faber, Gerb & Soffen, New York City, for plaintiff by Stanley H. Lieberstein, New York City.

Haight, Gardner, Poor & Havens, New York City, for defendants by John J. Reilly, New York City.

## OPINION AND DECISION

MILTON POLLACK, District Judge.

The plaintiff, Great Lakes Carbon Corporation, filed suit on August 8, 1980 against its former employee, defendant E. Thomas Fish, for an injunction and damages claiming that Mr. Fish had breached his fiduciary duties to and an employment contract with plaintiff by taking employment in May 1980 with one of plaintiff's competitors and using confidential and trade secret information of the plaintiff in his new employment to the detriment of plaintiff. Named as co–defendants, were Mr. Fish's new employer, Koch Carbon, Inc. and its parent, Koch Industries, Inc.

Jurisdiction was posited on complete diversity of citizenship of the parties and requisite amount in suit. However, plaintiff, a Delaware corporation, being satisfied shortly after filing of the suit that defendant Koch Carbon, Inc., the new employer of Mr. Fish, is also a Delaware corporation, promptly filed a voluntary dismissal of said defendant from this suit, without prejudice. Rule 41(a)(1)(i), Fed.R.Civ.P.

Plaintiff moved for a preliminary injunction, which was denied and a prompt trial of the merits was ordered. The issues were tried at a Bench trial on September 8th and 9th, 1980 and at the conclusion of the trial, the complaint against defendant, Koch Industries, Inc.–a Kansas corporation–was dismissed for absence of evidence to sustain a claim for relief against that defendant; it is not the employer of Mr. Fish and no activity or connection with the employment of Mr. Fish or the matters asserted in the claims herein was claimed or shown. Decision was reserved on the claims against Mr. Fish.

For reasons appearing hereafter, the complaint against Mr. Fish must be dismissed, on the merits.

### I.

Great Lakes alleged four claims for relief in its complaint: (1) breach of contract by Mr. Fish, (2) misappropriation of confidential information, (3) inducement by the corporate defendants of Mr. Fish to breach his contract, and (4) tortious interference by defendants with the business relations between Great Lakes and its suppliers of petroleum coke.

Mr. Fish denied plaintiff's claims and asserted his good faith and fair dealing in all matters pertaining to his employment, the severance thereof and in his activities in his new employment. Koch Industries, Inc. denied any connection at all with the claims in suit.

### II.

Great Lakes is a private company whose principal business is the manufacture and distribution of carbon and graphite products such as electrodes used in the manufacture of steel and special carbon products. Petroleum coke–a by–product of petroleum refining–is the principal component and in some instances the only component of the items sold by Great Lakes.

Petroleum coke is a solid residue after distillation of petroleum feed stock. The country's oil refiners sell the unprocessed petroleum coke to users and to those who in effect act as distributors or brokers for customer users. The petroleum coke is graded on the basis of levels of impurities. The less pure coke is used for fuel, the

purer coke is subjected to calcining—a dehydrogenation process to drive off volatile matter by placing the coke in a controlled high temperature. Great Lakes is the country's largest purchaser of unprocessed petroleum coke, handling about 35 percent of the market. There are approximately 56 refineries under the control of 32 companies producing petroleum coke and Great Lakes had short term supply agreements negotiated by Mr. Fish on its behalf with about 19 of the 56 suppliers.

There is no mystery concerning the identity of the refineries that have supplies of petroleum coke for sale. Each year in March the "Oil and Gas Journal" publishes a list of each of the major petroleum companies and their refineries from which petroleum coke producers may be determined, with an indication of the daily tonnage production of each refinery. The publishers of that Journal also publish a book entitled "USA Oil Industry Directory" which identifies the specific individuals at each refinery who are in charge of selling coke. The oil refineries readily disclose, as a matter of general practice, the period of petroleum coke contracts, the quality of the coke and the production rate, and the price opener terms in such contracts, the periods (quarterly or semi–annually) during the term of the contract at which the contract becomes open for rebidding, i. e., when someone else may also bid for the balance of the contract. The refineries readily disclose this information because they are anxious to develop the competition among potential purchasers of petroleum coke. There is an outstanding Federal Trade Commission industry–wide order which requires the manufacturers of petroleum coke to advise all potential purchasers thereof of any supply of petroleum coke which becomes available for bid. This order also requires that all contracts for purchase of petroleum coke shall be for no more than three years. *In the Matter of Great Lakes Carbon,* 82 F.T.C. 1529 (1973).

Since 1976, Koch Carbon, Inc. has aggressively sought supplies of petroleum coke from virtually every manufacturer in the United States; it has bid every supply that has come up. Prior to employing Mr. Fish, Koch Carbon, Inc., with but two exceptions, had contracted with, made bids to, or had substantial contacts with every one of the suppliers with whom Mr. Fish had formerly negotiated on behalf of Great Lakes. This includes the principal suppliers of petroleum coke, particularly, Amoco, Getty, ARCO, Texaco and Chevron.

Since about 1973, with certain limited exceptions, the worldwide price for petroleum coke has increased. There have been temporary periods when the worldwide demand for petroleum coke has exceeded the available supply due to fluctuating conditions pertaining to oil refining and other times when there has been a surplus of supplies. In the latter situation, as for example in 1978, when the price was diminishing, purchasers went often to suppliers for price relief on existing contracts and obtained relief in the form of price decreases by revealing their internal and external cost figures and the prices at which they sell to their customers. Great Lakes has obtained price relief on the basis of such disclosures from Amoco, Mobil, Sun, Getty, NCRA, Texaco and possibly others. Great Lakes made no secrecy agreements with any supplier concerning the disclosure of such internal and external costs and selling prices in respect to petroleum coke.

### III.

The defendant E. Thomas Fish was employed on an at–will basis during his entire 26 year connection with Great Lakes. He began his career with plaintiff in 1954 and he worked for them continuously until 1973, when he was asked to transfer from the West Coast to the East Coast. For personal and family reasons, Mr. Fish was unwilling to make the transfer, so he resigned to seek other employment outside of the petroleum coke business. After six months, however, he asked to be reinstated with Great Lakes, accepting the transfer to the East Coast. He was reinstated, but Great Lakes nonetheless refused to credit him with his 19 years seniority toward pension rights.

Mr. Fish started his employment as a process engineer for graphite electrodes. During subsequent years, until 1973, he served as a research engineer, salesman and sales manager. When he was re–employed after the 1973 break in employment, he was named product manager for graphite electrodes in the petroleum coke field.

On May 15, 1975 Mr. Fish was made Director of Raw Materials. In that capacity, he assumed primary and direct responsibility for the procurement of petroleum coke supplies. Although no longer employed in a technical engineering capacity he signed the same type of contract that he had signed when he had entered Great Lakes' employ as a process engineer. The agreement was couched in terms that bound him to respect the secrets and confidential information of Great Lakes. In relevant part, the agreement provided:

4. All processes, formulae, drawings, data, reports, technical know–how, maps, plans, documents, business secrets, and information of any and every kind pertaining to the existing and/or contemplated business of, and belonging to Company, obtained by Employee from any source whatsoever while in the employ of Company, and which are not in the public domain, shall, for the duration of the employment and thereafter, be regarded and treated by Employee as secret and confidential and Employee shall not disclose the same to others, or use the same for the benefit of Employee or others, without the consent in writing of Company.

\* \* \* \* \* \*

7. Employee agrees that for three years following the termination of Employee's employment, or for such part of three years as may be found lawful in the applicable area, Employee will not undertake any employment competitive with Company wherein the loyal and complete fulfillment of the duties of the competitive employment would inherently call upon Employee to reveal, to base judgments upon, or otherwise to use, any Company trade secret information to which Employee had access while employed by Company.

Mr. Fish served as director of procurement of petroleum coke supplies until October 1, 1979 when he was replaced by another in that capacity and Mr. Fish was transferred again to manage the Sales Department dealing with customers. He was not asked to sign a new agreement (no mention was made of the 1975 agreement). Mr. Fish continued to serve Great Lakes at its pleasure as an employee at–will. Mr. Fish's successor in the procurement function occasionally consulted with Mr. Fish concerning negotiations with different suppliers primarily to canvass Mr. Fish's background knowledge and familiarity with the terms of supply agreements and his personal knowledge of the key people at the oil refineries from which Great Lakes purchased supplies. Mr. Fish kept himself informed on the changing market price of unprocessed petroleum coke in connection with his role in the Sales Department since commitments and prices to Great Lakes' customers depended upon the availability and market price of petroleum coke.

## IV.

In March 1980, while attending the National Petroleum Refining Association Convention in New Orleans, Mr. Fish was approached by James F. Runner, a vice–president of Koch Carbon, Inc., a long time competitor of Great Lakes in the petroleum coke field. Mr. Runner asked Mr. Fish whether he would be interested in employment with Koch and he responded that he might be interested. Within a day or two Mr. Fish reported this approach to two of his superiors at Great Lakes and the response he had made. Some weeks later, Mr. Runner and Mr. Fish were at a trade dinner in New York and Mr. Fish was invited to visit Koch at its Boston office. He decided to make that visit and did so on April 15, 1980. The day before he went to Boston Mr. Fish reported to his superior at Great Lakes that he intended to make the visit to Koch. On the day after his return Mr. Fish reported to his superior at Great

Lakes that a general discussion had been had but no offer of employment had been made by Koch.

On May 7, 1980 Mr. Runner telephoned to Mr. Fish to offer him his current position. Koch's offer included appropriate recognition toward a pension, an increase in compensation and certain employment perquisites. Mr. Fish considered the offer and made his decision to accept it on the following Monday, May 12th and gave notice of resignation to Great Lakes. They promptly met Koch's salary offer, finally offered to reinstate Mr. Fish's pension rights and asked Mr. Fish to reconsider his resignation. However, Mr. Fish declined their offer and Great Lakes asked him to leave immediately on May 14th.

Mr. Fish joined Koch Carbon, Inc. on May 15, 1980. The evidence established that Mr. Fish scrupulously avoided taking any Great Lakes' documents or copies thereof with him, or anything else belonging to Great Lakes.

Immediately upon becoming employed by Koch, Mr. Fish participated in the formulation of his new employer's bid on calcinable petroleum coke available for sale at Chevron's Salt Lake City plant. Great Lakes, Koch and ten other companies were bidding on Chevron's coke supply. Koch had been asked specifically by Chevron in April 1980 to submit a bid. Koch believed that its stiffest competition would come from Alcoa, Gary Energy, or Great Lakes Carbon. Alcoa had the distinct advantage of being an end-user; Gary Energy had the advantage that it had been historically and would be the processor of this unprocessed coke. Koch had its own special formulae for composing a bid, arriving at a bid by a different route than that used by Great Lakes. Koch, with Mr. Fish participating, used its own formulation in establishing its bid to Chevron.

■ Koch submitted its bid on May 27, 1980 of $74 a ton for the Chevron coke. This bid had been calculated by the employee in charge of such matters at Koch with due regard for Chevron's demand for an escalation clause in the contract. At the time Koch decided to make the bid neither Koch nor Mr. Fish knew what bid Great Lakes had submitted to Chevron nor whether Great Lakes had acceded to Chevron's demand for an escalation clause. Koch did not determine its bid with regard to any knowledge of the bid that plaintiff did or might make. Prior to his resignation from Great Lakes, Mr. Fish had discussed the Chevron supply with certain of plaintiff's employees and had expressed the opinion that its market value was $70 per ton, plus or minus 10%. Great Lakes, however, did not decide on the amount of or submit its bid until a week after Mr. Fish had left Great Lakes. The Court specifically finds that Mr. Fish expressed the same personal estimate of market value of the Chevron supply to Great Lakes and to Koch. The bid of each firm expressed its own economics, estimates of its particular costs, profit expectancies and use or resale prospects. The credible evidence establishes that there was no improper advantage taken of Great Lakes by Mr. Fish or Koch in respect to the Chevron supply of petroleum coke. Indeed, the internal cost to Great Lakes of calcining the Chevron coke was never known to Mr. Fish. Without that knowledge, it was not feasible to solidify the ultimate bid of Great Lakes for the Chevron coke. That component of the bid emanated from the Minerals Division before the amount of the bid was fixed, which was after Mr. Fish had left. On the other hand, the most critical factor to Koch in calculating its bid for the Chevron supply was the price at which it would be able to resell the coke to its own customers. That resale price was significantly affected by the price published in trade papers for processed coke. The Court finds that Koch did not adjust its own formulae for estimating a bid price to overbid Great Lakes nor did Mr. Fish do anything to influence an overbid.

■ During his employment with Great Lakes, Mr. Fish learned of the availability of about 8,000 tons of coke at the Lockport Refinery of Texaco Oil Company. Mr. Fish had negotiated a contract to purchase that coke for Great Lakes for about $60 a ton.

However, Great Lakes learned that the supply was contaminated and, independently of Mr. Fish, undertook to negotiate a discounted price for the coke because it was off-specification. On or about May 30, 1980, subsequent to Mr. Fish's departure from Great Lakes, Great Lakes offered Texaco $14 per ton for the contaminated supply. After joining Koch Mr. Fish offered $30 per ton to Texaco for the coke on Koch's behalf. Texaco reported the offer to Great Lakes and apparently the latter decided not to meet it and Texaco accepted the Koch bid. The Court finds that Mr. Fish did not know the discounted price Great Lakes had bid for the Texaco contaminated coke and did not use or breach any confidence of Great Lakes in making the successful $30 bid for Koch.

## V.

■ Great Lakes contends herein that Mr. Fish is unlawfully diverting or seeking to divert to Koch supplies of petroleum coke available at the refineries with which Great Lakes had business. Great Lakes says it has imparted alleged confidences to Mr. Fish which he is using and will use to get coke supplies from its refinery suppliers in violation of his contract and fiduciary duty as a former employee of Great Lakes. These presumed confidences were described broadly by its vice-president as follows:

Since the supply of petroleum coke is crucial to the business of Great Lakes Corporation its relationship with each of its suppliers is of exceptional importance. Because of that importance, each agreement with a supplier is individually and carefully negotiated and constructed. Negotiations with a supplier are based on prior internal meetings at which the terms of those negotiations are discussed and the price to be offered for the raw petroleum coke is arrived at. Those terms and our evaluation of price are based not only on market data but reflect the needs and capacity of the various divisions of Great Lakes Carbon Corporation, the intended use of the petroleum coke and the internal costs, production and other economic data and operating

conditions within Great Lakes Carbon Corporation.

\* \* \* \* \* \*

The terms of Great Lakes Carbon's supply agreements, prices and renewal dates and the economic data on which those terms are formulated constitute valuable information and are trade secrets. This information is so sensitive to Great Lakes Carbon Corporation's business that access to it is limited even within the Company to highly trusted, key management personnel. As Director of Raw Materials acquisition, E. Thomas Fish was one of those highly trusted key management personnel.

\* \* \* \* \* \*

I would review with Mr. Fish the economic basis for the negotiation of contract terms including particularly the economic criteria specific to Great Lakes Carbon Corporation upon which its price determinations are made.

\* \* \* \* \* \*

Mr. Fish had access to and was intimately familiar with our trading and commercial practices and had detailed knowledge of its methods of operation including the details as to how Great Lakes Carbon would construct its price offers for petroleum coke as a raw material.

Great Lakes contends that the knowledge, experience and expertise that Mr. Fish acquired during his employment with the plaintiff enables him to predict quite closely the bids that Great Lakes will make and the price range within which Great Lakes can profitably afford to bid for petroleum coke.

Great Lakes allegedly operated its coke division on a 7½ percent mark-up for overhead and a divisional 4 to 7 percent profit expectancy. While not broadcast, these were fluid goals dependent on many variables of business oscillations which perforce do not become imbedded into concrete restricted business confidences for all time. More to the point perhaps, there is no credible evidence that such information was

safeguarded for use only in the organization and announced to be or treated as a business secret by Great Lakes. The particular business data of a company are in a sense unique to the company and are typically not widely publicized. However, sophisticated business men are quite aware that their competitors will always factor into their bids for supplies the internal elements of overhead and profit expectancy. In the case of Great Lakes, it was no more than an attempt to run this particular division at a profit. Many additional factors of an intangible nature which vary from time to time and market to market including overhead and profit expectancies go to make up bids for raw materials; these are estimated in relation to the current economic and market conditions, cost of money, sales prices of the product to customers, the efficiency of the operations and undoubtedly other elusive factors.

The evidence clearly indicates to the Court that Mr. Fish was not by reason of his knowledge of a broad expectancy of divisional mark–up and profit, a privy thereby to any trade secret information or protected confidences of Great Lakes. Any information that Mr. Fish obtained while in the employ of Great Lakes can be of no more than transient benefit or use to him in his present employment due to the many inconstant and changing elements to be considered in reaching a judgment on value of a raw material to an employer.

It was admitted by plaintiff, and the Court finds, that the price of unprocessed petroleum coke was within the control of the selling refineries. There is open bidding for supplies of the product; indeed a restraint on competition for an available supply would be improper, if not also illegal. The plaintiff did not have and cannot claim a lock on the sources of supply or the opportunities to buy such coke from oil refineries.

Mr. Fish, while in the employ of Koch, did not in any way interfere with any existing commitment that any refinery had to supply petroleum coke to Great Lakes. He was, however, free to seek and bid for uncommitted supplies or supplies becoming available for rebid. The sources of the available supplies of petroleum coke are not a trade secret, nor copyrighted or patented information nor a business confidence of Great Lakes. Nor are Mr. Fish's predictions and calculated estimates of market value or the bids based on such estimates the trade secrets or business confidences of Great Lakes. The price at which Koch or Great Lakes can profitably bid is dependent on too many unpredictable variables and personal judgments entering into the equation for it to be a protected trade secret under the facts and circumstances established in this case. Mr. Fish took no business from his former employer in which the latter had a tangible expectancy and which would not likely have been won away by a competitor. Great Lakes held no assurance that it would obtain or retain the Chevron or Texaco coke.

As already mentioned, there is no evidence that any effort was made to identify, label or keep the Great Lakes data secret or confidential. Indeed, the evidence is to the contrary. The 1978 disclosures by Great Lakes of detailed price and cost data to the refiners in order to secure price relief is one example. Another example was provided by Mr. Runner, a vice–president of Koch. Mr. Runner testified that for ten years he had been employed by Alcoa, a worldwide purchaser of supplies of petroleum coke. In that employment he authored a commodities study which contained a substantial amount of information concerning the Great Lakes Carbon operation, which Great Lakes readily disclosed to him while he was at Alcoa. That information, which plaintiff here attempts to label secret or confidential, included the number and location of Great Lakes' plants, Great Lakes' petroleum coke sources, and the existence of Great Lakes' contracts with the suppliers. Mr. Runner pointed out in his testimony and papers that all of the factors affecting or entering into a bid for supplies, except the desired profit margin, are in the public domain.

Finally, no technical information of any kind nor any information relating to work

performed at the research laboratories of Great Lakes is involved in the claims as presented herein. Nor was there any showing that any information concerning the nature, identity, or characteristics of the business customers of Great Lakes was involved in any way in this case.

Under the facts and circumstances as resolved by the evidence credited, Mr. Fish did not act unfairly or improperly toward Great Lakes in serving Koch. There has been no tortious interference with contract nor violation of contract or fiduciary duty owing by Mr. Fish and Great Lakes has not established any damages by reason of acts of Mr. Fish.

## VI.

In his summation, counsel for Great Lakes represented that the company's purpose is to enjoin Mr. Fish from dealing or negotiating with refiners with whom plaintiff had contracts for petroleum coke. He stated that the company does not request that the Court enjoin Koch Carbon from competing independently of the services of Mr. Fish–rather, that the plaintiff wants to restrain Koch Carbon from using Mr. Fish as indicated. This position was aptly characterized by defendants' counsel as an effort to prevent Mr. Fish from using his skill and judgment.

██ The authorities are uniform in holding that a former employee cannot be restrained from using his faculties, skills or experience learned, acquired or developed during his former employment. *Tempo Instrument, Inc. v. Logitek, Inc.*, 229 F.Supp. 1 (E.D.N.Y.1964). That case set forth the law of New York regarding price and cost estimates and holds that they are not "trade secrets" or protected confidences and is dispositive on the facts here. Quoting from *Krause v. Gardner*, 99 N.Y.S.2d 588, 594–95 (Sup.Ct.1950), the Court held as follows:

The plaintiff claims that one of the trade secrets wrongfully used by the defendants was the plaintiff's *method of estimating costs*. The defendants readily admitted that the defendant corporation used it. But this is no trade secret, the use of which this court will enjoin. It is a matter of experience, knowledge of the business, and judgment. The factors to be considered in making estimates are fundamental–inside costs, outside costs, overhead, and profit. The amount of money making up each factor necessarily fluctuates with the market. *There is nothing secret* in the decision of how much of a mark–up percentage is necessary for a good profit. Good estimating in this industry has the same common denominators as in others–experience and intelligence. (Emphasis added)

In *Anchor Alloys, Inc. v. Non–Ferrous Processing Corporation*, 39 A.D.2d 504, 336 N.Y.S.2d 944 (1972), it was similarly held, albeit in a case involving customers of a former employer, that an employee's *knowledge of prices and costs* in the metals industry do not constitute a "trade secret" and any restraint on the employee's use of such knowledge following the termination of his employment was not "reasonably necessary" to the former employer's protection.

The applicable concepts have also been expressed as follows:

[N]ot all information acquired by the employee during the course of his employment which may be pertinent to his employer's business is worthy of protection, but only those certain types which have reached the status of trade secrets. The law recognizes that knowledge, skill or information–except trade secrets and confidential information–acquired by the employee during his employment become a part of the employee's personal equipment. They belong to him as an individual for the transaction of any business in which he may engage, just the same as any part of the skill, knowledge and information received by him before entering the employment.

Kalinowski, "Key Employees and Trade Secrets," 47 Virginia L.Rev. 583, 586 (1961) (footnotes omitted).

The comments of the Court in *Reed, Roberts Associates, Inc. v. Strauman*, 40 N.Y.2d 303, 386 N.Y.S.2d 677, 353 N.E.2d 590 (1976), are particularly relevant to the case at bar.

. . . [A]bsent any wrongdoing, we cannot agree that Strauman should be prohibited from utilizing his knowledge and talents in this case .... *A contrary holding would make specialists in certain aspects of an enterprise virtual hostages of their employers.* Where the knowledge does not qualify for protection as a trade secret and there has been no conspiracy or breach of trust resulting in commercial piracy we see no reason to inhibit the employee's ability to realize his potential both professionally and financially by availing himself of opportunity.

40 N.Y.2d at 309, 386 N.Y.S.2d at 680–81, 353 N.E.2d at 594 (1976) (Emphasis added).

■ Since there is no credible evidence of trade secrets or protected business confidences that were carried away by Mr. Fish and used by him in his new employment it is legally unnecessary to independently appraise the validity of the restrictive covenant herein. If such an appraisal were required, due regard would be accorded to the powerful considerations of public policy which militate against sanctioning the loss of a man's livelihood. A covenant of an employee that he will not compete with his former employer is limited by the test of reasonableness both in scope and duration. The covenant in this case, if it survived in fact, fails the test of reasonableness.

■■ The three year restriction against employment by competitors who would use or take advantage of trade secrets or confidences of Great Lakes apparently was exacted in 1954 when Mr. Fish held a technically-oriented engineering position. It seems to have been an inappropriate legal form for use in respect to his later employment as a procurement agent. *Non constat,* it is unconscionably broad, improper and unenforceable as a contract. The definition of secrets so as to include information of every kind obtained by the employee is absurd. The time restriction is unreasonable for the transitory data with which Mr. Fish compiled his bids. There is no geographical limitation whatsoever. The normal friendships and business contacts arising between a procurement agent and a supplier's personnel are insufficient support for any restraint, much less one so broad. Restrictions against the use by a former employee of his accumulated experience, skill, appreciation of intangibles and judgment in his new employment would effectively bar him from all employment and are beyond legal limits and would have to be declared to be void.

The complaint, in all respects, is dismissed on the merits, with costs.

The foregoing shall constitute the findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).

So ordered.