**WEBCRAFT TECHNOLOGIES, INC., Plaintiff,**

v.

**Margo C. McCAW, Defendant.**

**No. 87 Civ. 6642 (PNL).**

United States District Court, S.D. New York.

Nov. 25, 1987.

Golenbock and Barell, New York City, Arthur M. Handler, Robert S. Goodman, Brian J. Kearney, Kimmelman, Wolff & Samson, P.A., of counsel, for plaintiff.

Brauner Baron Rosenzweig Kligler Sparber Bauman & Klein, New York City, Mel P. Barkan, Amy D. Levine, of counsel, for defendant.

LEVAL, District Judge.

This is a motion for a preliminary injunction. Plaintiff Webcraft Technologies, Inc., seeks to enjoin defendant Margo McCaw, a former employee of Webcraft, from disclosing confidential proprietary information relating to Webcraft's business and from soliciting or servicing any Webcraft customers for two years. Webcraft further seeks an order requiring McCaw to return to Webcraft any documents obtained by McCaw in the course of her employment at Webcraft. Webcraft contends that McCaw is in violation of a contractual obligation not to compete or expose trade secrets, as well as of fiduciary duties arising out of the employment relationship.

The parties first appeared on Webcraft's application for a temporary restraining order on September 18, 1987. No action was taken on the application and the conference was adjourned until September 22 to allow McCaw an opportunity to retain counsel. When the parties returned on September 22, counsel for both parties executed a consent temporary restraining order. It was also ordered on consent that discovery take place on an expedited schedule and that the preliminary injunction hearing be conducted on a submitted record of affidavits, depositions, and exhibits.

The record amply supports Webcraft's application for preliminary relief. The motion is accordingly granted.

## Background

Webcraft in the business of manufacturing custom printed material such as catalogs, free-standing inserts, computer-related promotional games, printed fragrance samples, personalized printed documents, lotteries, and cosmetic samples. Most of Webcraft's products are produced by "in-line finishing," whereby a finished product is produced in one continuous multi-step procedure, including printing on both sides and finishing through such steps as folding, turning, gluing, scoring, perforating, and cutting.

McCaw was hired as a sales representative by Webcraft in November 1984. She signed an employment agreement with covenants prohibiting her from competing with Webcraft or soliciting Webcraft customers within the continental United State for a period of two years and from disclosing any trade secrets relating to Webcraft's business. For the next four months, McCaw familiarized herself with Webcraft's products, business procedures, and technical capabilities. She visited the various departments at the plant and attended a week-long training course. She learned Webcraft's production capabilities and its method for estimating and quoting prices.

In late March 1985, after completing her training, McCaw started work at Webcraft's New York City office. As a condition of continuing employment, she was requested to sign a superceding, and somewhat more restrictive, employment contract. The superceding agreement contains a broad, worldwide covenant not to compete or solicit customers for a period of two years from the date of termination of employment; a trade secrets provision barring the disclosure of confidential information relating to Webcraft's business, including the names and needs of Webcraft customers and Webcraft pricing information; and a provision designating certain material—such as notes, specification and lists compiled while at Webcraft—as property of Webcraft and requiring its return upon leaving Webcraft. McCaw signed the superceding agreement on May 6, 1985.

In June 1987, McCaw was approached by William Mattran, the Eastern Regional Sales Manager of Tech Web, Inc. Tech Web is a competing printing firm based in Wheeling, Illinois which, like Webcraft, does in-line finishing. Mattran explored with McCaw the possibility of her coming to work as a sales representative at Tech Web's New York office. McCaw made a brief visit to Tech Web's New York office and met over lunch with Mattran to discuss employment with Tech Web. During the lunch meeting, McCaw made a list for Mattran of her fifteen or twenty best known customers and prospects at Webcraft. McCaw maintains that the list was made so that Mattran could assess her selling experience and also discern whether there were any conflicts between her list and the customer/prospect lists being serviced by Tech Web.

On July 9, 1987, upon visiting Tech Web's plant in Wheeling, Illinois, McCaw was offered a position in Tech Web's New York sales office; she accepted the offer and agreed to start work just over three weeks later on August 3.

McCaw neither tendered her resignation nor gave notice to Webcraft, but stayed on for three weeks concealing both the fact of her expected departure and that she was going to a competing firm. On Friday, July 31, 1987, she submitted her resignation, effective immediately. Her supervisor reminded her of the obligations under the employment contract. In addition, Webcraft's counsel sent her a letter restating these obligations. The following Monday, McCaw began work for Tech Web.

During the three week interlude between accepting employment with Tech Web and notifying Webcraft that she would be leaving, McCaw passed confidential Webcraft information to Tech Web. She spoke with Gerald Shapiro, Tech Web's Vice President of Sales and Marketing, on several occasions. She provided him with the job specifications on at least two accounts sought by Webcraft. In addition, she provided pricing information. As to one customer she advised Shapiro of the need to beat $29 per thousand. She also telecopied a sketch

of a proposed product to Tech Web's New York production manager. McCaw testified that her reason for passing the information to Tech Web while still employed at Webcraft was to allow Tech Web to prepare a price estimate to be ready as soon as she arrived at Tech Web. Within two days of arriving at Tech Web, McCaw sent price quotes to both prospective customers.

Also upon arriving at Tech Web, McCaw sent letters to most of her former Webcraft customers and viable prospects. The letters indicated that she had left Webcraft for Tech Web and that Tech Web offers many of the same services provided by Webcraft. She followed up most of these letters with telephone calls and, in many cases, with personal visits. In addition, McCaw submitted a list of her Webcraft customers and viable prospects to Shapiro, which he entered, in part, into Tech Web's computer data base.

McCaw also removed certain tangible property from the Webcraft office.[1] Before leaving Webcraft, McCaw photocopied her rolodex. She then left the copy with Webcraft and brought the original with her to Tech Web. The rolodex contains 113 cards, 28 of which identified companies (and the appropriate contact) also appearing on McCaw's customer list. In addition, McCaw removed eight pages of Webcraft quotes and pricing sheets relating to three possible jobs she pursued while at Webcraft. These included the two jobs she discussed with Shapiro while still at Webcraft, as well as a third. As with the first two, although McCaw made a bid on the third job upon arriving at Tech Web. McCaw also brought with her a statement of Webcraft's commission plan for its sales representatives.

Webcraft also alleges that, after the imposition of the consent temporary restraining order, McCaw sent a job quote to a customer she learned of while at Webcraft.

## Discussion

To win a preliminary injunction in this Circuit, the moving party must demonstrate "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them fair ground for litigation and a balance of hardship tipping decidedly toward the party requesting the preliminary relief." *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir.1979) (per curiam); *see also LeSportsac, Inc. v. K-Mart Corp.*, 754 F.2d 71, 74 (2d Cir.1985). I am convinced that both branches of the *Jackson Dairy* test are satisfied.[2] The evidence reviewed above shows that McCaw was guilty of serious breaches of not only her employment agreement but also of the fiduciary obligations of trust that grow out of the employment relationship. During her last three weeks of employment, after accepting employment with a competitor, she embezzled and converted valuable trade secrets of her employer, passing them on to her future employer.

Although in some respects the restrictive covenants of the Webcraft agreement are overbroad, they are not so overreaching as to void the entire agreement including its reasonable portions. In many provisions that McCaw violated, the agreement is reasonably designed to protect Webcraft's

1. All of the removed property is subject to the confidentiality stipulation, and hence is currently being held by McCaw's attorney. McCaw asserts that she has directed counsel to return the property to Webcraft regardless of the outcome the pending litigation. (McCaw Aff. ¶ 32.)

2. Although recognizing that *Jackson Dairy* was itself a diversity action, the defendant maintains that in a diversity action state law should dictate the standard for determining whether a preliminary injunction should issue. *But compare* 11 C. Wright & A. Miller, Federal Practice and Procedure: Civil § 2943, at 390–91 (1973) ("[I]t seems clear that plaintiff should be able to obtain ... a preliminary injunction to preserve the status quo even though he is suing to enforce a state right and those devices are not provided for by the forum's law or are available only upon a different showing than is required under Rule 65.") I am convinced that preliminary relief is appropriate under the New York, as well as the Second Circuit, standard. *See Watmet, Inc. v. Robinson*, 116 A.D.2d 998, 498 N.Y. S.2d 619, 619 (4th Dept.1986) (moving party must demonstrate likelihood of success on the merits; irreparable harm; and, balancing of equities tipping in its favor).

trade secrets. The motion for a preliminary injunction is accordingly granted.

## I.

The May 6, 1985, employment contract between McCaw and Webcraft imposes broad restrictions on competitive activity for two years after termination of employment. It provides that,

> following the effective date of the termination of ... employment with Webcraft, ... she will not, for ... herself or as a[n] ... agent or employee of any other person, firm or corporation, directly or indirectly, render any services in connection with the manufacture, development, sale or servicing of any product competitive with, or usable for substantially the same purpose as, any product manufactured or sold or in the process of development by Webcraft *or, for a period of two years following said termination date, solicit business from or service the accounts of any customer of Webcraft during the two year period preceding said termination date.*

(PX 7) (emphasis supplied.)

In addition, the contract restricts McCaw from disclosing "trade secrets," which the agreement defines as including, among other material, the names of Webcraft's customers and the Webcraft products they use; the methods used by Webcraft in developing price bids; and "any other confidential information or data relating to the business of Webcraft which is not publicly known." (*Id.*)

Finally, an exiting employee is required to leave with Webcraft "all memoranda, notes, records, charts, formulas, specifications, lists and other documents ... concerning any phase of Webcraft's business or its trade secrets...." (*Id.*)

It is clear that McCaw violated both the letter and spirit of the trade secrets provision. Her activity while still officially employed by Webcraft establishes a brazen breach of the covenant not to expose trade secrets. She passed to Tech Web Webcraft customer information, project specifications and pricing details. After starting with Tech Web, she turned over a list of her Webcraft customers and prospects to Shapiro, who entered some of these names into the Tech Web computer.

She also violated the provision requiring the return of "all memoranda, notes, records, charts, formulas, specifications, lists and other documents made, compiled or received, held or used by, the Employee while employed by Webcraft, concerning any phase of Webcraft's business or its trade secrets...." McCaw admits having taken the rolodex, eight pages of Webcraft quotes and pricing sheets, and a statement of Webcraft's commission plan for its sales representatives.

It is uncontested that McCaw solicited business from her own former Webcraft customers and other Webcraft customers when she began her employment at Tech Web.

## II.

McCaw contends that even if Webcraft has established that she has breached her employment agreement, it is not entitled to relief because the contract provisions are not legally enforceable. In particular, McCaw maintains that the provisions are unenforceable because the information sought to be protected is already public knowledge and because the non-solicitation clause is too broad, and thus void as against public policy.

As a preliminary matter, the parties differ in their view of what law should apply. Webcraft contends that the employment agreement's New Jersey choice of law provision should be enforced, while McCaw maintains that because New Jersey law in this area is contrary to the stated public policy of New York—the forum state—the choice of law provision would not be enforced by New York courts. New York and New Jersey's public policies are not so seriously in conflict that New York courts would decline to honor a contractually agreed choice of law clause. *Cf. Raven v. A. Klein & Co., Inc.,* 195 N.J.Super. 209, 478 A.2d 1208, 1210 (App.Div.1984) (finding no significant difference between New York and New Jersey enforcement of

restrictive employment covenants). Both disfavor overbroad noncompetitive clauses that effectively tie a salesperson to her employer. *Compare, e.g., Columbia Ribbon & Carbon Mfg. Co. Inc. v. A–1–A Corp.*, 42 N.Y.2d 496, 398 N.Y.S.2d 1004, 396 N.E.2d 4 (1977), *with Solari Industries, Inc. v. Malady*, 55 N.J. 571, 264 A.2d 53 (1970). But both recognize the legitimacy of an employer's concern that a faithless employee will steal trade secrets and confidential information to benefit a new employment. *See id.* Although New York's rules are somewhat more protective of the employee, the differences are not so great that New York's public policy is offended by application of New Jersey's rules, especially in the case of a faithless employee who has converted trade secrets to make herself more attractive to a new employer. Such conduct is not favored by either state.

If it were necessary to decide I believe the courts of New York would honor the contract choice of law provision and would apply New Jersey law. *See* Restatement (Second) of Conflict of Laws § 187 (1971); *Freedman v. Chemical Construction Corp.*, 43 N.Y.2d 260, 401 N.Y.S.2d 176, 179–80, 372 N.E.2d 12 (1977). But nothing turns on the question because McCaw would be enjoined under New York law as well.

Under New York and New Jersey law, restrictive covenants which interfere with an individuals ability to pursue her vocation after leaving a particular employer are disfavored, although not *per se* unenforceable. *See American Broadcasting Cos., Inc. v. Wolf,* 52 N.Y.2d 394, 438 N.Y.S.2d 482, 486–87, 420 N.E.2d 363, 366–67 (1981); *Purchasing Assocs., Inc. v. Weitz,* 13 N.Y. 2d 267, 246 N.Y.S.2d 600, 604, 196 N.E.2d 245 (1963): *Ecolab, Inc. v. K.P. Laundry Machinery, Inc.,* 656 F.Supp. 894, 899 (S.D. N.Y.1987); *Whitmyer Bros., Inc. v. Doyle,* 58 N.J. 25, 274 A.2d 577, 580–81 (1971); *Solari Industries, Inc. v. Malady,* 55 N.J. 571, 264 A.2d 53 (1970). The employer's interest in protecting itself from unfair conduct is balanced against the public policies favoring uninhibited competition and disfavoring depriving an employee of her livelihood. Accordingly, restrictive employ-

ment covenants are enforced only if "necessary to protect the employer from unfair competition which stems from the employee's use or disclosure of trade secrets or confidential customer lists," and "reasonably limited temporally and geographically," *Columbia Ribbon & Carbon Mfg. Co., Inc. v. A–1–A Corp.*, 42 N.Y.2d 496, 398 N.Y.S.2d 1004, 1006, 369 N.E.2d 4 (1977), and not unduly harsh or oppressive, *American Broadcasting Cos.*, 438 N.Y.S.2d at 486, 420 N.E.2d at 367. *See also Whitmyer Bros.*, 274 A.2d at 581–84; *Ingersoll–Rand Co. v. Ciavatta*, 216 N.J.Super. 667, 524 A.2d 866 (App.Div.), *certif. granted,* 108 N.J. 192, 528 A.2d 18 (1987). McCaw contends that there has been no disclosure of protected trade secrets and that the non-compete covenants are accordingly not enforceable. Her argument fails.

### A. Trade Secrets or Confidential Customer Lists

■ The evidence clearly shows that McCaw has converted information which Webcraft considers confidential, including the identity of Webcraft's customers and prospects; the identity of Webcraft's contact person at each customer or prospect; customer preferences with respect to printed products and promotions; and knowledge of Webcraft's prices and pricing methods. McCaw contends that, to the extent she was privy to such information, it is either unprotectible or generally known throughout the mass market printing community, thus, precluding enforcement of the restrictive covenant, *see Greenwich Mills Co., Inc. v. Barrie House Coffee Co.,* 91 A.D.2d 398, 459 N.Y.S.2d 454 (2d Dept. 1983).

### Customer Lists

McCaw contends that there is nothing secret about the identity of Webcraft's customers and prospects and that the lists are accordingly not protected. Although the list of *prospective* customers may not qualify for trade secret protection, the list of actual customers is a different matter. Webcraft has successfully shown likelihood

of success on the merits as to the customer list.

The list of prospects is put together from easily available sources. Although considerable work goes into compilation of the list, which includes some 10,000 names, McCaw may be correct that it would not be considered a trade secret.

The list of Webcraft's customers is a completely different matter. Although it may be self-evident that Company A is a prospective customer for any seller of printing services, Webcraft sells the unusual in-line finishing process. The evidence shows it is a long, difficult process to educate and convert a prospective customer to the benefits of the process. Thus the confidential value of Webcraft's customer list lies not only in its identification of *someone's* customers for printing, but more importantly, especially for competitors in the in-line process like Tech Web, in that it identifies customers who have learned and have bought the benefits of in-line finishing.

McCaw testified that developing a customer is an "arduous" process (McCaw Dep. at 71), that took between two months and two years to accomplish (*id.; see also* Babiuk Aff. ¶ 8). The sales representative would first attempt, generally through a series of telephone calls, to identify the proper contact at the prospect. Then, the telephone contact would be followed-up by letters, the sending of samples, attendance at meetings, development of presentations, and attempts to learn customer preferences and demands, and pricing information. As McCaw testified, "[i]t would take follow-up calls monthly or bi-weekly to keep in touch and develop a rapport with a customer." (McCaw Dep. at 71.) Ultimately, Webcraft might be asked to quote a job, which might or might not result in the placement of an order.

The long time needed to develop a customer was largely because "[t]he specialized nature of Webcraft's business was not useful to many people, many kinds of advertising or direct mail customers," (McCaw Dep. at 72), and because "[t]o utilize Webcraft's technology, a lot of develop- ment takes place on the creative side, on the marketing side," (Babiuk Dep. at 23). "[E]ducating those people as to what in-line finishing is, is a very difficult, tedious and long process. Most people are intimidated by technology, not understanding it." (*Id.*)

This is not a case like *Leo Silfen, Inc. v. Cream*, 29 N.Y.2d 387, 328 N.Y.S.2d 423, 427, 278 N.E.2d 636, 639 (1972), "where the customers are readily ascertainable outside the employer's business as prospective users or customers of the employer's services or products...." In such a case, "trade secret protection will not attach and courts will not enjoin the employee from soliciting his employer's customers." *Id.*, 328 N.Y.S.2d at 427, 278 N.E.2d at 639.

The Court of Appeals in *Silfen* expressly distinguished the case where customers are not readily ascertainable, but only discoverable with great effort, and particularly where the patronage of such customers was secured through the expenditure of considerable time and money, ruling that such a list is a protectible trade secret. 328 N.Y.S.2d at 428, 278 N.E.2d at 639; *see also Giffords Oil Co., Inc. v. Wild*, 106 A.D.2d 610, 483 N.Y.S.2d 104, 106 (2d Dept. 1984). The Court also noted that "if there has been a physical taking or studied copying, the court may in a proper case enjoin solicitation...." 328 N.Y.S.2d at 427, 278 N.E.2d at 639; *see also Lincoln Steel Products, Inc. v. Schuster*, 49 A.D.2d 618, 371 N.Y.S.2d 157 (2d Dept.), *appeal dismissed*, 38 N.Y.2d 738, 381 N.Y.S.2d 41, 343 N.E.2d 759 (1975). Another factor for consideration is whether the effort invested in developing the customers simply involved widespread canvassing, as was the case in *Leo Silfen*, or whether the employer actually worked to create a market for a new service or good. *Compare id.*, 328 N.Y.S.2d at 429, 278 N.E.2d 640 *with Town & Country House & Home Service, Inc. v. Newberry*, 3 N.Y.2d 554, 170 N.Y.S.2d 328, 147 N.E.2d 724 (1958). Finally, the Court in *Leo Silfen* suggests that its holding is limited to cases where there is no express non-solicitation agreement between the parties. 328 N.Y.S.2d at 430, 278 N.E.2d at 641.

The evidence shows that Webcraft's customer lists took enormous time and effort to develop, including the development of a specialized knowledge of the customer's operations and needs; that the identity of customers for in-line finishing was by no means available to a stranger, but was confidential and a valuable trade secret. It was of particular value to Tech Web whose own list coincided with McCaw's Webcraft list as to only two names. (Mattran Dep. at 67–69.)

In addition, unlike *Leo Silfen*, McCaw physically removed the portion of her customer and prospect list represented in her rolodex. Although she maintains that she could have remembered the names and contacts of her few customers and only took the rolodex for convenience, the fact remains that she took the list and no doubt it helped her remember far more than she could have remembered without it.

Finally, the Court of Appeals in *Leo Silfen* indicated that it relied on the absence of an express agreement in finding that the relevant customer list was not protectible. McCaw, however, signed an agreement including a non-solicitation provision and a trade secrets provision which expressly included customer lists within its protection.

I find that Webcraft is likely to succeed on the merits in demonstrating that the customer lists qualify as a trade secret, and that it is entitled to a preliminary injunction by reason of McCaw's misappropriation of it.

*Contacts*

■ McCaw also contends that the identity of client contacts is not a protectible secret. I disagree.

McCaw acknowledged that it could easily take several telephone calls over a period of time (McCaw Dep. at 72.), and perhaps a meeting, to identify the proper contact (McCaw Aff. ¶ 23). Babiuk testified that it takes "extensive work to identify" the proper contact. (Babiuk Dep. at 36.)

In support of her contention that the identity of such contacts is not subject to trade secrets protection, McCaw relies on *Great Lakes Carbon Corp. v. Koch Industries, Inc.*, 497 F.Supp. 462, 471 (S.D.N.Y. 1980). But she reads too much into that case. Although the friends and acquaintances acquired in the course of a history of business dealings in an industry is not generally considered a trade secret, different considerations apply where a list of useful and influential contacts among customers and prospects is accumulated with considerable effort for the benefit of the employer. *See, e.g., Churchill Communications Corp. v. Demyanovich*, 668 F.Supp. 207, 212 (S.D.N.Y.1987).

Although some of McCaw's contacts are apparently friends, and in one case a relative, in general the list represents the names which she discovered through substantial research for sales purposes at the expense of her employer. Many of these names were recorded in the rolodex which McCaw brought with her to Tech Web.

This is data collected on behalf of and at the expense of Webcraft. It is not generally available information; it is maintained in confidence and is valuable to a competitor. Webcraft is likely to succeed on the merits in showing that the contacts list qualifies as a trade secret.

*Customer Preferences & Pricing Information*

■ There is little doubt that information which McCaw learned while employed at Webcraft concerning customer preferences and Webcraft's pricing is protectible. *See Churchill Communications Corp.*, at 212; *Business Intelligence Services, Inc. v. Hudson*, 580 F.Supp. 1068, 1072 (S.D.N.Y.1984); *Giffords Oil Co., Inc. v. Wild*, 106 A.D.2d 610, 483 N.Y.S.2d 104, 106 (2d Dept. 1984); *Greenwich Mills Co., Inc. v. Barrie House Coffee Co.*, 91 A.D.2d 398, 459 N.Y.S.2d 454, 459 (2d Dept.1983). McCaw's primary objection to conferring protected status on this material is that she had little information. She contends that the pricing factors are complex and not susceptible to prediction based on prior experience. Likewise, McCaw contends that she knows only "general predilection" as to preferences, without specifics, and that any specifics that were known were only "momentarily significant."

I find these contentions border on the frivolous. McCaw misappropriated highly specific information including eight pages of price quote sheets and solicited at least three former contacts based on information concerning pricing and customer preferences which she learned through her employment at Webcraft. McCaw has not shown that the information she brought with her concerning prices and customer preferences is obsolete. This was substantially contradicted. (*See, e.g.,* Babriuk Dep. at 74, 78, 121–22.)

\* \* \*

In sum, I find an abundance of evidence that McCaw has misappropriated protectible trade secrets and confidential customer lists which are valuable and are entitled to protection. Webcraft is likely to succeed on the merits in demonstrating this.

### B. *Scope of the Restriction*

■ McCaw is correct in arguing that the contractual restrictions are in some respects too broad to comport with the public policies of New York and New Jersey opposing excessive restriction on an employee's ability after employment to continue to earn her livelihood in her field. For example, the restriction covers solicitation of any customer of Webcraft regardless whether the employee had any contact with or even knowledge of that customer's dealings with Webcraft. Nor is this restriction limited to the employee's geographic area. Also different parts of the restrictive clause are inconsistent with one another. The first clause seems to bar the employee without time limitation from any participation in any sale of a competing product while the second clause limits the restriction to two years, as well as to solicitation of those who have been Webcraft customers within the last two years. The narrower restriction would be read as a limitation on the scope of the former.

Under either New York or New Jersey law, the restrictions are broader in the respects noted above than courts are likely to enforce. It does not follow, however, that the entire provisions would be voided. In appropriate circumstances, courts may "blue pencil" an overbroad restrictive covenant to enforce only its reasonable provisions. *See Greenwich Mills Co., Inc.,* 459 N.Y.S.2d at 457; *USAchem, Inc. v. Goldstein,* 512 F.2d 163, 168 (2d Cir.1975); *Karpinski v. Ingrasci,* 28 N.Y.2d 45, 320 N.Y. S.2d 1, 6–7, 268 N.E.2d 751, 754–55 (1971); *Solari Industries, Inc. v. Malady,* 55 N.J. 571, 264 A.2d 53, 56–61 (1970). As the New York Court of Appeals wrote in *Karpinski,* "If in balancing the equities the court decides that his [the employee's] activity would fit within the scope of a reasonable prohibition, it is apt to make use of the tool of severance, paring an unreasonable restraint down to appropriate size and enforcing it." 320 N.Y.S.2d at 6–7, 268 N.E.2d at 755, *quoting* Blake, *Employee Agreements Not to Compete,* 73 Harv.L. Rev. 625, 674–75 (1960).

There are factors that weigh against blue-pencilling. Too great a readiness on the part of courts to preserve the valid portions of overbroad restrictions would induce employers to draft such restrictions overbroadly, intimidating the sales force by the ostensible terms of the written contract and relying on courts to enforce the valid portion against an employee who is not intimidated. Notwithstanding that legitimate concern, however, absent good reason, courts should generally try to preserve what is valid in a contract. Webcraft is not shown to have practiced serious overreaching. McCaw has not shown unfairness to her in enforcing portions of the covenants. If anything, the equities here strongly favor Webcraft, as it is McCaw who has behaved badly.

And in the end, it is not crucial whether the contract is saved by blue-pencilling because McCaw's breaches of her fiduciary duties in deliberate theft of Webcraft's trade secrets are sufficiently clear and serious to warrant enjoining her even if there were no covenant not to compete. The duty not to convert one's employer's trade secrets to one's own use is sufficiently clear that it need not be set forth in a contract. Webcraft has shown a likelihood of success in proving that it is entitled to an injunction by reason of McCaw's conver-

sion of trade secrets, irrespective of the contract. *See Advance Biofactures Corp. v. Greenberg,* 103 A.D.2d 834, 478 N.Y.S.2d 344 at 346; *McKay v. Communispond, Inc.,* 581 F.Supp. 801, 806 (S.D.N.Y.1983); *Sun Dial Corp. v. Rideout,* 16 N.J. 252, 108 A.2d 442, 446 (1954). In *Town & Country House & Home Sevices, Inc. v. Newberry,* for example, the New York Court of Appeals found that the plaintiff was entitled to an injunction barring several of its former employees from soliciting its customers, notwithstanding the absence a contractual obligation not to compete. 170 N.Y.S.2d 328, 147 N.E.2d 724.

### III.

Webcraft has established irreparable harm, plus a likelihood of success on the merits in demonstrating that McCaw misappropriated certain confidential material in violation of enforceable contractual and fiduciary obligations owed Webcraft. It is entitled to a preliminary injunction.

■ As to the scope of the injunction, I do not believe it should cover potential purchasers with whom McCaw had no contact and as to whom she acquired no information while at Webcraft. Her wanton conversion of Webcraft's trade secrets, however, justifies application of the injunction to any account she solicited, contacted or acquired information about while she was in Webcraft's employment. The injunction should cover any entity about which she took information to Tech Web. This may mean she will be enjoined as to some entities as to which the information she took was not a confidential trade secret. On the other hand, it is so clear she has stolen trade secrets that Webcraft should not be required to run the risk of her so profiting on accounts where Webcraft cannot prove her theft. In view of her clearly established breach of fiduciary duty, I believe this correctly draws the line. It leaves her free to solicit the remainder of the universe of prospective customers.

Plaintiff's application for sanctions for violation of the consent temporary restraining order is denied without prejudice to reassert upon a showing of continued violation.