**DATATYPE INTERNATIONAL, INC., Plaintiff,**

**v.**

**Scott PUZIA, Defendant.**

**No. 92 Civ. 3946 (CSH).**

United States District Court, S.D. New York.

July 2, 1992.

Wiener & Block, New York City, for plaintiff (Meryl Weiner, of counsel).

Parker, Dwyer, Rosoff & Hoyt, New York City (Elissa Brickell, of counsel) and Felzenberg, Winter & Winkler, Livingston, N.J., for defendant (Jason Winkler, of counsel).

## MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge:

In this diversity action, plaintiff Data-Type International, Inc. ("DataType") sues to enforce a restrictive covenant contained in an employment agreement with defendant Scott Puzia, a former employee. Plaintiff also seeks compensatory and punitive damages.

Plaintiff moved for preliminary injunctive relief by order to show cause. The Court advanced trial of the action on the merits with the hearing on the application for a preliminary injunction. *See* Rule 65(a)(2), Fed.R.Civ.P. Trial of the equitable issues has been completed. This opinion constitutes the Court's findings of fact and conclusions of law. Rule 52(a).

## Background

Plaintiff DataType is a New York corporation maintaining its offices at 145 E. 57th Street, New York City. Gail Propp is its president. Defendant Puzia is a New Jersey resident. DataType employed Puzia as a sales representative from 1982 until February 1992, when he resigned.

DataType is a direct mail company. Such companies offer expertise, guidance and program development to clients seeking to generate business by direct mailings to potential customers. The activities of direct mail companies give rise to that social and postal phenomenon popularly known as "junk mail" (although the industry prefers a different phrase).

DataType specializes in direct mailings for the pharmaceutical industry, comprised of pharmaceutical manufacturing companies and the advertising agencies that serve them. Pharmaceutical industry direct mailings are sent to physicians and nurses. They are intended to generate sales of pharmaceutical products, such as prescription drugs.

During the decade of his employment at DataType, Puzia was the company's principal salesman. He is effective at his job and over time built up useful relationships and contacts with product managers at pharmaceutical companies and account executives at advertising agencies.

Propp's expertise lies in computer programming, which plays a vital part in effective direct mail operations. Until the events about to be recounted, Propp owned all the shares of DataType. She relied on Puzia as the company's principal salesman, although she would attend presentations to potential customers on occasion.

On December 14, 1988 the parties executed two written agreements, each dated in its preamble as October 5, 1988. One was an "Agreement for Sale of Shares." It reflects a sale by Propp to Puzia of 60 shares of Class B non-voting common shares of DataType for $10,000, to be paid over twelve monthly installments.

The other agreement was captioned "Executive Employment Agreement." ¶ 1 provided:

## EMPLOYMENT

The Corporation [DataType] hereby employs the Executive [Puzia] and the Executive hereby accepts employment upon the terms and conditions hereinafter set forth. This Agreement may be terminated at will by either party which termination shall be effective immediately upon notice being given. If terminated by the Corporation the Executive shall be entitled to his compensation for an additional Thirty (30) days following termination.

¶ 9 provided:

## RESTRICTIVE COVENANT

(a) While this Agreement is in effect, and for a period of Two (2) years after the termination of this Agreement, the Executive shall not, either directly or indirectly, compete with the Corporation or engage in any business similar to that conducted by the Corporation, within a radius of One Hundred Twenty Five (125) miles (the "restricted area") of the then principal office of the Corporation, whether as a shareholder, officer, director, sole proprietor, partner, employee, consultant, representative, lender, investor, independent contractor, agent or other capacity. Solicitation or acceptance of accounts outside the restricted area which entail services to be rendered to office or business locations within the restricted area shall constitute competition in violation of this Agreement.

(b) The Executive shall not, for a period of Two (2) years following termination of this Agreement, either directly or indirectly contact or solicit any "customers" of the Corporation, wherever located. As used herein the term "customers" shall be defined as any person or entity to whom or with which the Corporation (i) has provided services during the Eighteen (18) month period prior to termination, or (ii) is, at the time of termination, involved in negotiations for the providing of such services.

Propp signed the agreements for Data-Type. Puzia signed for himself.

Drafts of these agreements, prepared by DataType's attorney, had been shown to Puzia in July 1988 by Propp and Laurence Kramer, a consultant retained by Propp to advise on corporate matters. With respect to the restrictive covenant, Puzia asked and Propp agreed to reduce its duration from three years to two, and its geographical limit from 250 miles to 125 miles.

Prior to preparation of the draft agreements, Propp and Puzia had discussed the possibility of selling DataType. In a 10–page memorandum dated April 9, 1988 that Puzia sent to Propp, DX A, Puzia began by saying:

It's been six years since we started Data-Type, and I feel it's time for a look backward and forward. How are we progressing with our original plan to start this company, make it profitable and then sell it?

In that memorandum Puzia referred, among other things, to the many hours he devoted to the business each day, at night, and on weekends; asked that his compensation be increased; and referred to prior discussions about "my receiving partial ownership in the Company." In that regard, he expressed the view that "25% ownership would be a fair figure."

Propp responded by raising Puzia's base salary from $24,000 to $40,000 in May 1988. (Puzia was also at all times compensated by a 12% commission on net sales of business he had obtained for the company). Propp retained Kramer to assist her in the matter. Kramer suggested to Propp "that the sale of stock be contingent upon the preparation of an employment agreement that would include a covenant not to compete." Tr. 25. That gave rise to the July 1988 drafts, which Kramer discussed upon a number of occasions with Puzia, and to which Puzia eventually agreed, after requesting and obtaining the previously noted changes.

Puzia testified at trial that Propp and Kramer both assured him that the restrictive covenant was included in the employment agreement solely for the pur-

pose of reassuring a prospective purchaser of the company; and that Propp would enforce the covenant against Puzia only in the context of the company's sale. Puzia contended at trial that these representations by Kramer and Propp were false when made, intended to secure Puzia's agreement to the restrictive covenant, and that Puzia relied upon them to his detriment. Puzia contends that Propp's fraudulent conduct presents the converse of a case such as *Sabo v. Delman*, 3 N.Y.2d 155, 162, 164 N.Y.S.2d 714, 718, 143 N.E.2d 906, 909 (1957), where the New York Court of Appeals said that "a contractual promise made with the undisclosed intention not to perform it constitutes fraud." On that basis, Puzia contends that the restrictive covenant in the employment agreement is void.

I need not pursue Puzia's fraud theory further because he has not proved its factual predicate. On this issue Puzia bears the burden of proof. Kramer and Propp denied having told Puzia that DataType would not enforce the restrictive covenant. On the contrary, Kramer testified that when Puzia asked why the employment agreement and covenant were necessary, Kramer explained to Puzia "that if there was going to be a sale of shares of the stock of the company, where he would become an investor, an owner of the company, one of the requirements would be that he would have to sign a covenant not to compete." Tr. 32. That is a general proposition, unrelated in any way to a prospective sale of the company. Kramer testified further that he made it clear to Puzia that Puzia "should take these documents rather seriously, because they were being drafted by an attorney, that he should take then seriously because Mrs. Propp was going to enforce them, and ... I even strongly urged him to talk to an attorney about them because these were rather serious documents." Tr. 36. Kramer, who has done no business for Propp since 1988 and has no stake in the outcome of this litiga-

tion, was a credible witness and I accept this testimony. Furthermore, Puzia's contention that he was a victim of fraud surfaced for the first time at the trial. He did not make that claim in an action for determination of the legal rights and restrictions of the parties to the employment agreement which he commenced in the Superior Court of New Jersey, Bergen County, on May 28, 1992. Nor did he claim fraudulent inducement in any of the several discussions he had with Propp subsequent to his departure from DataType in February 1992.

In short, Puzia has not proved his claim of fraud. The rights and obligations of the parties therefore depend upon the provisions of the restrictive covenant, viewed in the light of governing law.[1]

DataType paid Puzia the money Puzia used to pay Propp for the shares covered by the stock purchase agreement. The increase in Puzia's salary, coupled with commissions generated by his effective salesmanship, produced annual compensation in excess of $100,000. But Puzia remained dissatisfied with his job at DataType. He continued to work long hours. There was no discernible progress in arranging a profitable sale of DataType to a third party. Propp had spoken of a target sales price of $5 million, but DataType's profits never brought the company anywhere close to such a consummation, however devoutly wished. The determination grew in Puzia's mind to leave DataType. In 1986 Puzia had incorporated a company called Integrated Sales Systems. That company never did any business. On November 18, 1991 Puzia filed with the New Jersey authorities an amendment to that company's certificate of incorporation changing its name to Pharmaceutical Direct, Inc. At about the same time he also reserved a telephone line in the name of Pharmaceutical Direct, and arranged for office space if

---

1. Puzia testified at trial that he understood ¶ 1 of the employment agreement to mean he could "walk away" from the agreement at any time and "void" the restrictive covenant in ¶ 9. He also testified Kramer and Propp told him this. The contract cannot be read that way, and I do not credit Puzia's testimony that he was told it could.

that company ever became active. Puzia did not tell Propp of these activities.[2]

At a lunch meeting on November 13, 1991, Puzia told Propp that he would be leaving DataType. He submitted a letter of resignation dated February 11, 1992, PX 38, effective February 21, 1992, the date on which Puzia left DataType's employ.

Puzia accepted employment with a company pursuing a different, non-competitive business, but decided after only four days that he had made a mistake. Accordingly Puzia activated Pharmaceutical Direct, Inc., and began to compete with DataType, thereby generating this litigation.[3]

Propp's affidavit in support of plaintiff's order to show cause accused Puzia of numerous bad acts. The Propp affidavit at ¶ 3 charged that Puzia "clandestinely" set up his own competing business while still in plaintiff's employ; "pillaged" plaintiff's "most critical asset, ... its customer list"; is soliciting plaintiff's customers by using "trade secret information contained in plaintiff's files including the customers on plaintiff's customer list and plaintiff's pricing schedules"; and (upon information and belief) is "tortiously interfering with plaintiff's contracts with its customers" by predicting that plaintiff would be "going out of business soon" and implying that Puzia was DataType's "successor," which would have "a ruinous effect on plaintiff's present and future business." Propp added the allegation in ¶ 4 of her affidavit (underlining the assertion for emphasis) that: *"To date, plaintiff has lost the business of several of these Customers who, upon information and belief, are now doing business with defendant."* DataType's complaint sought, in addition to enforcement of the restrictive covenant, orders enjoining Puzia from such tortious interference; enjoining Puzia's use of DataType's "customer list"; and for an accounting.

■ The proof at trial failed for the most part to substantiate these charges. There is no persuasive proof that Puzia made disparaging remarks about DataType's customers, which is to say pharmaceutical companies and advertising agencies. Nancy Piasecki, DataType's traffic manager whose office adjoined Puzia's, testified that she overheard Puzia disparaging DataType during telephone conversations with individuals named Doug Hess and Duane Taylor. Hess is a personal friend of Puzia's from college days. He prints various business forms. Puzia had become disenchanted with DataType. I am prepared to accept that he said so to his old friend Hess in tones sufficiently penetrating for Piasecki to hear him. But Hess was not a customer of DataType's. Whatever disparaging remarks Puzia made to Hess about DataType could not constitute tortious interference with the latter's business.

Piasecki also testified that she overheard Puzia making negative remarks about DataType in a conversation with Taylor, the sole proprietor of an advertising "boutique" called Orion Associates. Orion had given business to DataType. Puzia denies having disparaged DataType to Taylor. Taylor testified at trial that Puzia had not done so. He further testified that at no time prior to Puzia's departure from DataType had Puzia made to Taylor the sort of crude, disparaging comments attributed by Piasecki to Puzia. Tr. 294–95. On the contrary, Taylor testified that he was surprised when he was indirectly informed that Puzia had left DataType because he had expressed no prior dissatisfaction. Tr. 295. While Taylor is an acquaintance of Puzia, the relationship is not close, and Taylor has nothing to gain in the litigation. I credit his testimony.

I do not credit the testimony of Piasecki that during the beginning of 1992, she overheard ten or fifteen "business" telephone calls in which Puzia said "that the company was going to go down the tubes in six months, it was going to go down the crapper, how everyone there was incompe-

---

2. DataType claims these activities breached Puzia's contractual obligation to devote all his energies to the company. Perhaps so; but during November 1991, Puzia generated business for DataType in record-breaking amounts.

3. During the increasingly acrimonious exchanges between Propp and Puzia, Propp reacquired Puzia's shares in DataType.

tent." Tr. 269. Piasecki, who is presently employed at DataType and consequently must be regarded as an interested witness, could not identify the other parties to these telephone calls. While she testified that she reported them to Propp and to Michelle Rinaldi, another DataType employee, Propp did not confirm that report in her testimony and Rinaldi was not called to testify. Plaintiff offered no evidence from any customer to whom Puzia had spoken in such terms.

Plaintiff did offer the deposition of Sol Meyer, the executive vice president of Dynatron, a data processing and production facility for the direct mail industry. Dynatron is a vendor of services to DataType. Meyer had dealt with Puzia for several years. In late 1991 Puzia visited Meyer at the latter's office and said he was going to leave DataType and anticipated "going into the direct mail and do what he was doing at DataType as soon as DataType goes out of business." Dep. Tr. 9. Puzia said to Meyer that he thought DataType was going to go out of business "[b]ecause he was the only one who was selling or had the ability to sell, and … he was running the company." *Id.* Puzia asked Meyer if Dynatron would render services to Puzia's company when it became active. Meyer agreed to do so, but in a subsequent discussion with Propp, in which Propp asked Meyer not to do business with Puzia, Meyer yielded to that request "because of the relationship Dynatron has had with DataType." *Id.* at 14. Indeed, Meyer cancelled the first order Puzia gave to him part way through its completion.

Within the context of DataType's claims against Puzia, there is less to this than meets the eye. In the first place, Dynatron cannot be regarded as a DataType customer. Dynatron was and is a DataType vendor. Even within that quite different context, Puzia caused DataType no damage because Dynatron ceased doing business with Puzia as soon as Propp made that request of Meyer.

According to Puzia's account of his conversation with Meyer, he told Meyer that DataType would fail if Propp, who maintained her own computer consultancy at a different address, did not become more personally involved in the company's business, but that if she did there was no cause for concern. Meyer does not deny that Puzia said that to him. Meyer's primary concern, understandably enough, was whether Data-Type would pay his outstanding invoices. Meyer testified:

> I recall Scott telling me that when he leaves, DataType would be in trouble. That's my recollection. If he said that Gail Propp has to take control over it or not, or those two things are dependent upon each other, I wasn't paying that close attention to the semantics of that conversation, what it will take to make it go.
>
> He clearly stated that the company will not be able to last for any long period of time. I do recall him saying six months, and that's my recollection. Dep. Tr. 31–32.

That is the sum and substance of Data-Type's trial testimony concerning Puzia's malicious conduct. The trial testimony showed that DataType did not maintain a separate "customer list," thereby undermining the literal initial charge made by Propp that Puzia had vindictively "pillaged plaintiff's most critical asset."[4] The pricing structures used to "quote" (or bid) on jobs are standard throughout the industry. As for disparaging remarks, a number of individuals Puzia contacted in an effort to start up his own business testified that he had only favorable comments to make about his former employer DataType. *See* deposition of Steve Barrett, an account executive at the advertising agency of Lewis & Gace, at Tr. 27 ("My recollection was that he was very gracious and said there was no particular reason why Marion Merrell Dow [a pharmaceutical company] shouldn't continue to do business with DataType International, Inc. … he had left

---

**4.** That observation does not completely dispose of the issue of whether Puzia made improper use of customer information acquired during his employment at Datatype, a subject considered *infra.*

behind a good running operation"); deposition of Douglas W. Frank, president of Concept Advertising, Inc. at Tr. 26 ("If you are saying like did he say anything derogatory about DataType, no. He has never said anything but nice things about Data-Type."); deposition of Julia Murphy, staff member at Lewis & Gace, at Tr. 9–10 (in meeting with Puzia and Barrett, Puzia said nothing disparaging about DataType, and Murphy recalled saying "it's interesting that you're so positive about a company that you're with no longer anymore"); trial testimony of Wayne Traub, account executive at the advertising firm of Sudler & Hennessy, at Tr. 363–65 (during sales calls prior to his leaving DataType and thereafter, Puzia did not disparage DataType in any manner).

DataType offered no proof at trial to identify customers whose business it had "lost" to Puzia, in the sense that DataType could no longer submit competitive bids. The most the evidence shows is that on a number of occasions Puzia contacted prior customers of DataType in an effort, not always successful, to drum up business.

There is one additional aspect of the proof I must deal with under this general heading. Michael Manfre, currently employed by DataType as its data processing manager, testified at trial that in November 1991 Puzia asked him out to lunch and offered Manfre a position with his new company at an annual salary of $52,000. According to Manfre, Puzia demanded an answer in three days; cautioned Manfre to say nothing about the conversation; declared he would deny the conversation if Manfre told anyone about it; and predicted that after he [Puzia] left DataType the company would be out of business in three months. Tr. 233–34. Manfre testified further that he did not tell Propp about the conversation because he was afraid he would lose his job if he said anything. Manfre turned Puzia down. Manfre and Propp testified that Manfre first told Propp of Puzia's overture during the evening of June 10, 1992, which was the first day of trial. Tr. 235–36.

Puzia acknowledges having lunch with Manfre, something he did on occasion. He testified that he did no more than assure Manfre about the continuing viability of DataType, in order to reassure Manfre's concerns arising out of his financial condition and family problems.

There is no way to reconcile these two accounts. Neither witness is disinterested, but Manfre displayed an uncomfortable demeanor during his testimony and his account is inherently unlikely. In November 1991 Puzia had no operating business, and would not have for several months. There was no pressing necessity for him to demand an immediate response from Manfre. Furthermore, Puzia's offer of a $52,000 salary to Manfre at this time is implausible. For all that appears in the evidence, Puzia had no capital. He would be required to pay Manfre a $52,000 annual salary, together with the usual employer's tax contributions and related charges, out of the revenues of Puzia's new company, once it got started. Manfre was DataType's data processing manager. This is a service that Puzia could purchase at nominal cost from such vendors as Dynatron without saddling his fledgling company with significant salary expense. In short, I find that I cannot accept Manfre's account of this lunch meeting.

In sum, plaintiff's initial accusations of malicious conduct on the part of Puzia are not sustained by the trial evidence.

It is also pertinent, in assessing Puzia's alleged bad faith, to consider the parties' efforts to resolve their differences prior to litigation. It is common ground that after Puzia told Propp he was going to leave DataType he sent her a list of pharmaceutical companies Puzia characterized as "core" DataType customers. Puzia agreed not to solicit any product divisions in those companies, and told Propp the list was "negotiable." Propp had told Puzia that she intended to enforce the restricted covenant. Puzia was attempting to avoid litigation. Propp rejected any such compromise. Given her view that the restrictive covenant was fully enforceable, Propp's rejection of Puzia's overtures is understandable. But

Puzia's efforts at accommodation undermine to some degree his portrayal as a thief in the night: the clear import of Propp's initial affidavit in support of plaintiff's order to show cause.

DataType contends that the restricted covenant bars Puzia, within its temporal and geographic limitations, from competing with DataType. ¶ 9(a). That would prevent him from offering direct mail services to any pharmaceutical company or advertising agency in that field within 125 miles of New York City for two years. DataType also seeks under ¶ 9(b) to bar Puzia from contacting or soliciting any pharmaceutical company or advertising agency, wherever located, with which Datatype had done any business or was negotiating to do business with during the 18 months prior to Puzia's departure. Because the restrictive covenant at ¶ 9(b) defines the term "customer" as "any person or entity," DataType contends that its provision of services to or negotiation with any division of a pharmaceutical company places the entire company beyond Puzia's reach. Similarly, any such contact with any account executive at an advertising agency places the entire agency off limits.

In order fully to explore the factors which determine the enforceability of restrictive covenants, I consider the evidence adduced at trial concerning the structure and functioning of pharmaceutical companies and the advertising agencies which serve them.

I find that pharmaceutical companies are typically made up of a number of divisions, each devoted to the manufacture and marketing of a particular product. These divisions are largely autonomous. A product manager deals directly with an account executive at an advertising agency and may play a part in the selection of vendors such as DataType. There is relatively little communication between product managers

with respect to their day-to-day operations. Similarly, advertising agencies are divided into account groups which deal with their pharmaceutical company accounts on a largely autonomous basis. There is a surprisingly small amount of cross-information and communication among account groups in the same agency. Douglas Frank, an experienced pharmaceutical advertising agency executive, rejected the concept suggested by plaintiff's counsel of an account executive as a "team player":

> I think the concept you expressed of being a team player is not really the case. You want your account to look good and you don't care if the other account looks good. Dep. Tr. 41.

I make these findings with respect to the structure and functioning of pharmaceutical companies and their advertising agencies on the basis of the clear preponderance of the evidence. Frank testified as to both advertising agencies and pharmaceutical companies; on the latter point, *see* Dep. Tr. 71–72.[5] Comparable testimony was given by Barrett, Dep. Tr. 9–25; Traub, Tr. 344–354; and Taylor, Tr. 313–314.

These circumstances bear upon an issue vigorously litigated by the parties: whether a salesman of services such as DataType's who has previously dealt with a particular product manager at a pharmaceutical company, or an account executive at an advertising agency, has an advantage in soliciting other product managers of the same company, or other account executives at the same agency. I find that the advantage is very limited. That is because the product divisions (at the companies) and the account departments (at the agencies) are largely autonomous and do not communicate much among themselves.

Plaintiff's evidence to the contrary is not persuasive. Jane Townsend, an executive with a health care advertising agency, testified that the rendition of efficient services

---

**5.** At trial plaintiff's counsel pressed an objection that Frank should not be allowed to express an opinion with respect to the operation of pharmaceutical companies without naming the sources upon which he based his most recent information. I decline to exclude Frank's testimony on that basis. Frank had worked for a leading pharmaceutical company from 1979 to 1984. As an advertising agency executive in the pharmaceutical field, he came into contact with other companies. The objection goes to the weight of Frank's testimony, and not to admissibility.

to one group in her agency would give the salesman an advantage in others. However, her particular agency employed two individuals in charge of direct mail services. Given that structure, "[u]sually, our two direct mail people will have the strongest voice" in picking the direct mail services vendor. Tr. 401. That arrangement is unique among the agencies whose operations were described by the witnesses. Robert DeLay, plaintiff's expert witness in the area of direct marketing, lacked sufficient personal knowledge to give persuasive evidence on the point.

### Discussion

■ Under the governing New York law, the enforceability of a restrictive covenant depends in part upon the nature of the underlying contract. In *Purchasing Associates v. Weitz*, 13 N.Y.2d 267, 246 N.Y.S.2d 600, 196 N.E.2d 245 (1963), the New York Court of Appeals observed that in earlier years restrictive covenants were not enforceable as in restraint of trade. More recently, courts have held that there are situations where it is not only desirable but essential to enforce restrictive covenants. Thus a restrictive covenant is enforceable in a contract for the sale of a business involving the transfer of good will as a going concern. *Weitz* at 13 N.Y.2d 271, 246 N.Y.S.2d 603, 196 N.E.2d 247. As District Judge McLaughlin (as he then was) observed in *Baker's Aid v. Hussman Foodservice Company*, 730 F.Supp. 1209, 1214 (E.D.N.Y.1990):

Reasonable restrictive covenants ancillary to the sale of a business are routinely enforced to protect the good will paid for by the purchaser. (citing *Chevron U.S.A., Inc. v. Roxen Service, Inc.*, 813 F.2d 26, 28 (2d Cir.1987)).

But restrictive covenants in employment agreements receive quite different treatment from the courts. As Judge McLaughlin also said in *Baker's Aid* at 1214:

Because enforcement of employee restrictive covenants may result in the loss of an individual's livelihood, such covenants are "rigorously examined" and enforced only to protect an employer from unfair competition stemming from—

among other things—the disclosure of trade secrets. (citing and quoting *American Institute of Chemical Engineers v. Reber–Friel Co.*, 682 F.2d 382, 387 (2d Cir.1982)).

■ In *Columbia Ribbon & Carbon Manufacturing Co., Inc. v. A–1–A Corp.*, 42 N.Y.2d 496, 499, 398 N.Y.S.2d 1004, 1006, 369 N.E.2d 4, 6 (1977), the Court of Appeals said:

Since there are "powerful considerations of public policy which militate against sanctioning the loss of a man's livelihood" ..., restrictive covenants which tend to prevent an employee from pursuing a similar vocation after termination of employment are disfavored by the law.... Such covenants will be enforced only if reasonably limited temporarily and geographically ... and then only to the extent necessary to protect the employer from unfair competition which stems from the employee's use or disclosure of trade secrets or confidential customer lists.... Thus, where the employer's past or prospective customers' names are readily ascertainable from sources outside its business, trade secret protection will not attach and their solicitation by the employee will not be enjoined.

(citations omitted).

More recently, the Court of Appeals said in *American Broadcasting v. Wolf*, 52 N.Y.2d 394, 403, 438 N.Y.S.2d 482, 420 N.E.2d 363 (1981), that an express anticompetitive covenant in a personal service contract "will be rigorously examined and specifically enforced only if it satisfies certain established requirements." The Court of Appeals went on to say:

Indeed, a court normally will not decree specific enforcement of an employee's anti-competitive covenant unless necessary to protect the trade secrets, customer lists or good will of the employer's business, or perhaps when the employer is exposed to special harm because of the unique nature of the employee's services.

(citations omitted) (footnote omitted).

These principles derive from "the notion that, once the term of an employment agreement has expired, the general public policy favoring robust and uninhibited competition should not give way merely because a particular employer wishes to insulate himself from competition." *Id.* at 52 N.Y.2d 404, 438 N.Y.S.2d 482, 420 N.E.2d 363 (citation omitted).

In *American Institute of Chemical Engineers, supra,* the Second Circuit, construing New York law and citing *Wolf* and *Columbia,* held: "Only after determining that a restrictive covenant would serve to protect against ... 'unfair and illegal' conduct and not merely to insulate the employer from competition, does the reasonableness of the covenant in terms of its 'time, space or scope,' or the oppressiveness of its operation become an issue." 682 F.2d at 387.

Accordingly the first step in the analysis is to determine whether Puzia's conduct, past or threatened, impacts upon DataType's legitimate protectible interests.

It cannot be said that DataType is exposed to special harm because of the unique nature of Puzia's services. Puzia is a salesman. To be sure, he is a very good salesman; but there is nothing unique about the nature of his services. Nor does DataType's method of doing business rise to the level of a trade secret. DataType does what all vendors of its particular services do. In any event, "knowledge of the intricacies of [plaintiff's] business operation ... does not qualify for protection as a trade secret." *Reed, Roberts Associates, Inc. v. Strauman,* 40 N.Y.2d 303, 309, 386 N.Y.S.2d 677, 353 N.E.2d 590 (1976).

The case therefore turns upon the protectibility of DataType's customers, as defined in the restrictive covenant. Puzia did not make off with a particular "customer list" in documentary form. But even if a former employer has not physically appropriated a customer list, he "may not 'solicit the customers of his former employer if they would be unknown to the employee but for information obtained during his prior employment.'" *Panther Systems II v. Panther Computer Systems,* 783 F.Supp.

53, 67 (E.D.N.Y.1991) (citing and quoting *Abraham Zion Corp. v. Lebow,* 593 F.Supp. 551, 569 (S.D.N.Y.1984), *aff'd,* 761 F.2d 93 (2d Cir.1985) (citing in turn *Ability Search, Inc. v. Lawson,* 556 F.Supp. 9, 15 (S.D.N.Y.1981), *aff'd,* 697 F.2d 287 (2d Cir. 1982)).

It is therefore necessary to consider the nature of the customers.

In *American Institute of Chemical Engineers* the Second Circuit, again construing New York law, summarized the governing principles:

> A customer list is not confidential where the past or prospective customers are "readily ascertainable" from sources outside the employer's business.... However, a court will prevent the solicitation by a former employer of customers "who are not openly engaged in business in advertised locations" or whose "availability as patrons cannot readily be ascertained but 'whose trade and patronage have been secured by years of business effort and advertising, and the expenditure of time and money, constituting a part of the good will of a business which enterprise and foresight have built up.'"

682 F.2d at 387 (citations omitted).

In *Webcraft Technologies v. McCaw,* 674 F.Supp. 1039 (S.D.N.Y.1987), Judge Leval drew a distinction between prospective and actual customers. Plaintiff was in the business of manufacturing custom printed specialty material. Ruling on a motion for a preliminary injunction, Judge Leval acknowledged that the plaintiff's "list of *prospective* customers may not qualify for trade secret protection," since it "is put together from easily available sources." 674 F.Supp. at 1044–45 (emphasis in original). He went on to say:

> The list of Webcraft's customers is a completely different matter. Although it may be self-evident that Company A is a prospective customer for any seller of printing services, Webcraft sells the unusual in-line finishing process. The evidence shows it is a long, difficult process to educate and convert a prospective customer to the benefits of the process. Thus the confidential value of Webcraft's

customer list lies not only in its identification of *someone's* customers for printing, but more importantly, especially for competitors in the in-line process like Tech Web, in that it identifies customers who have learned and have bought the benefits of in-line finishing.

*Id.* at 1045 (emphasis in original).

With respect to actual customers achieved through such effort, *Webcraft* was distinguishable from *Leo Silfen, Inc. v. Cream*, 29 N.Y.2d 387, 328 N.Y.S.2d 423, 427, 278 N.E.2d 636, 639 (1972), "where the customers are readily ascertainable outside the employer's business as prospective users or customers of the employer's services or products...." In such a case, "trade secrets will not attach and courts will not enjoin the employee from soliciting his employer's customers." As Judge Leval observed in *Webcraft* at 1045: "The Court of Appeals in *Silfen* expressly distinguished the case where customers are not readily ascertainable, but only discoverable with great effort, and particularly where the patronage of such customers was secured through the expenditure of considerable time and money, ruling that such a list is a protectible trade secret." [6]

*Ability Search, Inc. v. Lawson, supra,* also illustrates these principles. Plaintiff was engaged in the business of placing individuals in executive positions for a fee. Two former employees abruptly left, taking with them documents including files of candidates who were not pending. Following plenary trial, Judge Motley concluded that "information about *candidates* contained in ability search files and records is entitled to trade secret protection since this information is not readily ascertainable by defendants." 556 F.Supp. at 15 (emphasis in original). Plaintiff was granted injunctive relief accordingly. However, the court also held:

> The court further finds and concludes that Ability Search is not entitled to a permanent injunction with respect to in-

formation about corporate clients since it has failed to prove that defendants utilized any information about such clients which was not available from public sources or readily ascertainable by defendants in conducting their own business. *Id.*

*Ability Search* did not involve a restrictive covenant or anti-competitive clause in an employment agreement. Rather, the case illustrates the principle that an employee owes a fiduciary duty to his former employer and is prohibited from acting in a disloyal manner inconsistent with that trust relationship. *See also Ecolab, Inc. v. Paolo*, 753 F.Supp. 1100, 1112 (E.D.N.Y.1991) ("Moreover, even if this information did not independently rise to the level of a trade secret, Paolo's and Elliott's wrongful retention of the customer information would justify treating it as a trade secret"). As the Second Circuit observed in *American Institute of Chemical Engineers*, 682 F.2d at 389 n. 8, any bad faith of the defendant must be taken into consideration. The Second Circuit cited and quoted *Clark Paper & Manufacturing Co. v. Stenacher*, 236 N.Y. 312, 321, 140 N.E. 708 (1923): "Any unfair competition or practice may move equity to enforce a negative covenant."

Applying these principles to the case at bar, I conclude without difficulty that DataType is not entitled to trade secret protection with respect to all product divisions of a pharmaceutical company, or all account groups of an advertising agency, on the basis of its prior business relationship with a particular product manager or a particular account executive. Given the autonomous nature of these sub-entities, an entire company cannot reasonably be regarded as DataType's "customer"; nor can an entire advertising agency be so regarded. Product divisions and account groups with whom DataType has not done business must be regarded as *prospective* customers, as to which DataType's earlier

---

**6.** *Webcraft* may be distinguished from the case at bar on the ground that Webcraft furnished a specialized service, whereas DataType's services are indistinguishable in kind from its competitors'. That makes it more difficult to characterize even DataType's actual customers as protectible. But I think they qualify because of the effort and time necessary to cultivate them. "Actual" customers in the context of Datatype's business is further considered *infra*.

conduct of business with different divisions or groups yields no meaningful competitive advantage. Furthermore, these are prospective customers whose names, addresses, and telephone numbers of key contact persons are readily ascertainable in publicly available directories. *See The Pharmaceutical Marketers Directory* (1992 ed.), PX 35; *The Standard Directory of Advertising Agencies* (Feb. 1992), PX 43.

Accordingly the broad anti-competitive provisions of ¶ 9(a) of the employment agreement do not serve to protect a legitimate, protectible interest of the plaintiff. It follows that I need not reach the reasonableness of their temporal and geographic limitations.[7]

For the same reasons, the provisions in ¶ 9(b) which purport to protect DataType's "customers" by barring Puzia from company-wide and agency-wide solicitation are overbroad and unenforceable.

On the other hand, the particular company or agency individuals with whom Puzia developed on DataType's behalf a personal relationship, over time and at considerable effort, may be analogized to actual Data-Type customers qualifying for protection, whether on trade secret analysis or the broader ground of unfair competition. Where a restrictive covenant contains both reasonable and overbroad provisions, courts of equity may pare down the restrictions and fashion an appropriate injunction. *Baker's Aid* at 730 F.Supp. 1216.

■ However, I need not pursue the subject further because counsel for Puzia agreed during summation to such limited injunctive relief. During summation the following exchange occurred at Tr. 1063:

MR. WINKLER: If you will excuse me for a moment I will address the issue of inducement of the contract by fraud—

THE COURT: Before you do that, do you accept the proposition that the relationship that Mr. Puzia built up with particular specific individuals at the pharmaceutical companies or advertising agencies, during his 10 years at Data-Type as a DataType sales representative constitutes *proprietary and protectible interest as far as DataType is concerned?*

MR. WINKLER: *Absolutely and completely.* That has been available to the plaintiff, your Honor, though. I urge the court to consider that, that Mr. Puzia has tried a variety of avenues at resolving these issues, and that has always been one. Always.

(emphasis added).

If plaintiff's injunctive relief is limited in accordance with that concession, then I do not understand defendant to contest the temporal limitation contained in the restrictive covenant. In any event, I regard a two-year term to be reasonable within the context of an injunction prohibiting Puzia from soliciting only those particular specific individuals with whom he has previously dealt.

■ The remaining question is whether Puzia acted with such bad faith or malice that this Court, sitting in equity, should enforce a negative covenant more broadly than the law would otherwise require. I answer that question in the negative.

Those cases relying upon bad faith conduct as a justification for enforcing a restrictive covenant involved far more egregious conduct. In *Churchill Communications Corp. v. Demyanovich*, 668 F.Supp. 207 (S.D.N.Y.1987), the former employee removed from the office business records, computer discs, and customer lists, using those resources to start a rival company. In *Webcraft, supra*, the employee accepted a position with a competitor, did not tell her employer she had done so, continued to work for her employer for three weeks during which time she passed on to her new employer confidential information con-

---

7. Nor need I make detailed findings on an issue much litigated by the parties: the extent to which Puzia's expertise in pharmaceutical industry direct mail is transferable to other areas, such as general consumer direct mail. I am satisfied, however, that contacts and knowledge Puzia accumulated in a decade of specializing in the pharmaceutical industry are sufficient to implicate the public policy which causes the courts to disfavor restrictive covenants in employment contracts.

sisting of pricing information and job specifications for particular accounts, and physically removed upon departure her rolodex, employer's quotes on jobs and pricing sheets, and a statement of her employer's commission plan for its sales representatives. In *Ecolab, Inc. v. Paolo, supra,* the former employees retained invoices and reports, sent a copy of an invoice to a customer showing that it had not received a discount received by other customers, and composed detailed price comparisons using confidential information.

The case at bar is not such a case. As discussed *supra,* plaintiff's initial claims of bad faith on Puzia's part are not sustained by the credible evidence. The most that the evidence reveals is that Puzia, on six or so occasions, contacted individuals with whom he had previously dealt, despite a previously expressed willingness not to do so. Since the injunction to be entered in the case will prevent him from doing so for the next two years, DataType will receive all the protection from competition to which it is entitled under the cases.

### Conclusion

For the foregoing reasons, plaintiff is entitled to a permanent injunction restraining defendant for a period of two years from February 21, 1992 from soliciting or conducting business with the particular individuals at pharmaceutical companies or advertising agencies with whom he came in contact while in plaintiff's employ during the eighteen months prior to February 21, 1992.

Plaintiff is also entitled to the return of one of two pieces of computer equipment which it purchased and Puzia has retained in his home. As to the other piece of equipment, Puzia testified without contradiction that he acquired it from plaintiff in trade.

Plaintiff is entitled to no other equitable relief.

Counsel for defendant is directed to settle a Judgment and Order of Permanent Injunction consistent with this Opinion on seven (7) days' notice within fourteen (14) days of the date of this Order.

It is SO ORDERED.