IKON OFFICE SOLUTIONS, INC., Plaintiff,

v.

Arthur BELANGER, Defendant.

Civil Action No. 99–30047–MAP.

United States District Court, D. Massachusetts.

April 9, 1999.

---

Jeffrey R. Martin, Sorokin, Sorokin, Gross, Hyde & Williams, Hartford, CT, for Ikon Office Solutions, Inc.

David E. Rosengren, Pepe & Hazard, LLP, Boston, MA, Neal F. Splaine, Pepe & Hazard LLP, Boston, MA, for Arthur Belanger.

Neal F. Splaine, Pepe & Hazard LLP, Boston, MA, for DocuSource.

PONSOR, District Judge.

Upon *de novo* review this Report and Recommendation is hereby adopted, without opposition; plaintiff's motion is DENIED. This case will be set for a pretrial scheduling conference. So ordered. July 14, 1999.

### REPORT AND RECOMMENDATION WITH REGARD TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

NEIMAN, United States Magistrate Judge.

Plaintiff IKON Office Solutions, Inc. ("IKON"), seeks to enforce a restrictive covenant by preliminarily enjoining Defendant Arthur Belanger ("Belanger") from engaging in the sale and servicing of copying and facsimile equipment in the three counties of the Pioneer Valley. IKON also seeks to enforce a covenant which would restrict Belanger from calling on, contacting or communicating with any of IKON's customers or former customers, the identity of whom was learned by Belanger during the course of his employment with IKON or its predecessor, M.B.S. Business Systems, Inc. ("MBS").

The motion was referred to the court for a report and recommendation pursuant to Rule 3 of the Rules for United States Magistrates in the United States District Court for the District of Massachusetts. *See* 28 U.S.C. § 636(b)(1)(B). The court held a circumscribed evidentiary hearing on the motion on March 23, 1999, and thereafter received supplemental briefs from the parties. For the reasons set

forth below, the court recommends that IKON's motion be denied.

## I. *FACTUAL BACKGROUND*

There does not appear to be a significant dispute with respect to most of the material facts. Those which are somewhat disputed are highlighted below.

From 1983 until 1996, Belanger was a photocopy equipment salesman in MBS's West Springfield office. In early 1996, all outstanding MBS stock was acquired by Alco Standard Computing, which thereafter changed its name to IKON Office Solutions, Inc. At the time, IKON continued to employ Belanger. While so employed, Belanger was a major account representative responsible for soliciting and servicing a specific list of high volume accounts within Hampden, Hampshire and Franklin counties.

On October 1, 1996, approximately nine months after IKON acquired MBS, Belanger, together with approximately nine other sales representatives, was asked to attend a meeting by his sales manager, Robert Schnepp. Schnepp was also Belanger's sales manager when both were employed by MBS.

It is undisputed that Belanger, and apparently the other sales representatives, signed an "employment contract" with IKON at the October 1, 1996 meeting. Although the contract makes mention of "employment," "prior agreement," "compensation," and "duties," the crux of the agreement concerns two restrictive covenants, the interpretation of which form the focus of the current dispute between the parties. The first covenant would restrict Belanger's ability to compete with IKON in a particular geographic area for two years following the termination of his employment. That restriction reads as follows:

> During the period of employment and for a period of two (2) years following the termination of employment under this Agreement, Employee will not with-in any territory in which he/she may have worked at anytime during the 18–month period prior to the termination of his/her employment under this Agreement becomes self-employed or accept employment with, consult with, or become associated with any person, sole proprietorship, partnership or corporation in any capacity involving activities related to the sale and service of copying and/or facsimile equipment or the sale of copy and/or facsimile supplies . . .

The second covenant, in essence, would restrict Belanger from contacting any customer that he had learned about during his employ. It reads as follows:

> In addition, for a period of two (2) years following termination of employment under this Agreement, Employee shall not call on, contact or communicate with any customer or former customer of Employer, the identity of whom was learned during the course of Employee's employment for the purpose of soliciting sales of copying and/or facsimile supplies and copy and/or facsimile equipment or performing service on said equipment . . .

"Employer" is defined in the employment contract as "IKON Office Solutions." "Employee" is defined as "Art Belanger of MBS/IKON."

Belanger does not "remember being told by Mr. Schnepp that if we signed the agreement we would be given a raise or any other form of additional compensation or consideration." (Def.Opp. Exhibit A ¶ 15.) Schnepp, on the other hand, testified at the hearing on March 23, 1999, that he reviewed the new compensation plan with the sales representative at the October 1 meeting and "told them as far as the new compensation plan, they were requested to sign a non-compete document." (March 23, 1999 Transcript (Docket No. 12) at 4.) Schnepp claims to have provided a copy of the compensation plan to the sales representatives. (Id. at 8; Pl. Exhibit 2.) There is no issue that Belanger's continued employment was conditioned on

his signing the employment contract and the restrictive covenants contained therein.

About ten days after the October 1 meeting, Schnepp approved a "payroll change notice," effective October 1, in which Belanger's base salary was increased from $700 to $825 per week. (Pl. Exhibit 1 .) Authorized signatures on the payroll change notice, including Schnepp's, are dated October 11, 1996.

Slightly more than one year later, on or about December 31, 1997, Belanger voluntarily resigned from IKON. One year after that, in January of 1998, Belanger become associated with DocuSource L.L.C. ("DocuSource"), a new company organized to distribute copying equipment. Belanger invested $15,000 in DocuSource and runs its West Springfield office. For most of the intervening year, Belanger worked for Tortus–Tek, a company which provides internet and web design services. For a short period of time after November of 1998, when he left Tortus–Tek, Belanger received unemployment compensation.

## II. NON–COMPETITION AGREEMENTS

■ Under Massachusetts contract law, non-competition agreements are enforceable to the extent that they are reasonable and necessary to protect the employer's legitimate interests while not interfering with ordinary competition. *See All Stainless, Inc. . v. Colby,* 364 Mass. 773, 308 N.E.2d 481, 485 (1974). In deciding whether to enforce a particular agreement, a court should consider if the covenant (1) is necessary to protect the legitimate business interests of the employer, (2) is supported by consideration, (3) is reasonably limited in all circumstances, including time and space, and (4) is otherwise consonant with public policy. *See Bowne of Boston, Inc. v. Levine,* 1997 WL 781444, at *2 (Mass.Super. Nov.25, 1997). One such legitimate business interest may involve good will belonging to the employer, if the employer introduced the client to the sales-

man or the salesman cultivated his relationship with the client while employed by the employer. *Id.* A salesman may be in a position to harm the employer's goodwill if he possesses business secrets or confidential information, or if his close contact with the customer would lead the customer to associate the product with the salesman rather than with the former employer. *All Stainless,* 308 N.E.2d at 486.

## III. STANDARDS FOR PRELIMI- NARY INJUNCTIVE RELIEF

■ In seeking a preliminary injunction, a plaintiff must demonstrate: "(1) a substantial likelihood of success on the merits; (2) a significant risk of irreparable harm if the injunction is withheld; (3) a favorable balance of hardships; and (4) a fit (or, at least, a lack of friction) between the injunction and the public interest." *E.E.O.C. v. Astra U.S.A., Inc.,* 94 F.3d 738, 742 (1st Cir.1996) (citing *Narragansett Indian Tribe v. Guilbert,* 934 F.2d 4, 5 (1st Cir. 1991)). Failure to demonstrate all of the requirements proves fatal for a request for relief. *See Massachusetts Coalition of Citizens with Disabilities v. Civil Defense Agency and Office of Emergency Preparedness of Commonwealth of Mass.,* 649 F.2d 71, 74 (1st Cir.1981).

## IV. DISCUSSION

■ Viewing the requested relief through the lens of Massachusetts contract law, the court has no doubt that the geographic scope of the covenant, if otherwise enforceable, would be reasonable. *See Kroeger v. Stop & Shop Companies, Inc.,* 13 Mass.App.Ct. 310, 432 N.E.2d 566, 570 (1982). In the court's opinion, it is reasonable to restrict Belanger from the territory in which he worked in the eighteen months prior to terminating with IKON and easy enough for the parties to ascertain that region.

The same, however, cannot as easily be said with respect to the "customer specif-

ic" covenant. Although IKON describes Belanger's argument with respect to this covenant as hyper-technical, his assertions cannot be so readily dismissed. The covenant is not as clear and unambiguous as IKON assumes. Were the court to accept IKON's interpretation—that the covenant subsumes all customers developed over the course of Belanger's employment with MBS, as well as with IKON—IKON would be able to erase a kind of "data base" created prior to the existence of any restrictive covenant. The court does not believe that the covenant—which, after all, was drafted by IKON—can be so easily interpreted in its favor.

The court also doubts whether the two year restriction is reasonable given the present circumstances. Although two year restrictions are not uncommon, *see All Stainless*, 308 N.E.2d at 485 (two year restriction applicable to hardware salesman); *Bowne*, 1997 WL at 781444 *4 (two year for a printing salesman); *New England Tree Expert Co. v. Russell*, 306 Mass. 504, 28 N.E.2d 997 (1940) (three years for sales representative); *Cedric G. Chase Photographic Lab. v. Hennessey*, 327 Mass. 137, 97 N.E.2d 397 (1951) (two years for a salesman); *McFarland v. Schneider*, 1998 WL 136133 (Mass.Super. Feb.17, 1998) (five years for an investment advisor), the court does not believe that two years is categorically appropriate here when the time of employ, during which the restrictive covenants were in place, was only slightly greater than one year.

Granted, IKON makes much of the fact that Belanger worked for MBS for thirteen years prior to its acquisition by IKON. During that time, IKON asserts, Belanger "developed relationships that were long term and durable." (Pl.Supp. Mem. (Docket No. 08) at 9.) Moreover, IKON maintains, it "simply seeks to pro-

tect an asset that it has rightfully bought and paid for—the customer loyalty that it and its predecessor have compensated Arthur Belanger to build for them." (Id. at 14.) Such customer relationships and good will, IKON concludes, are protectable interests of an employer. *See Kroeger*, 432 N.E.2d at 570; *New England Canteen Serv., Inc. v. Ashley*, 372 Mass. 671, 363 N.E.2d 526 (1977); *American Express Financial Advisors Inc. v. Walker*, 1998 WL 754620 (Mass.Super. Oct.28, 1998).

While the good will may well be IKON's, the court remains unconvinced that the time period should be measured with reference to Belanger's term of employment at MBS. It is undisputed that MBS never had a non-competition covenant with Belanger and, accordingly, that IKON's purchase of MBS could not include such non-competition as an asset. Moreover, IKON itself did not condition Belanger's employment on any such covenants at the time it purchased MBS and continued to employ Belanger, IKON's representations to the contrary.[1]

Although IKON contends that "no case has been found that suggest[s] that the length of time between the execution of the covenant and the termination of the employment should be a factor to be considered," (Pl.Supp.Mem. at 8), it concedes that "a brief period of employment might be a legitimate consideration in determining whether to enforce a restriction." (Id.) The court discerns no meaningful distinction. Yet, even were the court to accept the distinction described by IKON, IKON must still demonstrate that consideration was paid and negotiations pursued at the time the covenants were executed. It is here where IKON falters.

Were the court to conclude that the particular restrictive covenants are reason-

---

1. In its original memorandum in support of its motion for preliminary injunctive relief, IKON made it appear that it required Belanger to sign the covenants at issue "in consideration of *becoming* an employee of IKON." (Docket No. 05 (emphasis added).) As be-

came clear at the evidentiary hearing, the covenants were not signed until nearly nine months later. In the interim, Belanger worked for IKON free from restrictive covenants.

able as to both time and space, and that they might protect IKON's legitimate business interests, the covenants do not appear to have been supported by any consideration. Thus, notwithstanding its preliminary concerns about the covenants themselves, the court does not believe that IKON has shown a substantial likelihood of success on the merits of its claim, given the absence of consideration. Moreover, the court believes that, given the balance of hardships, the covenants should not be preliminarily enforced against Belanger. As IKON itself acknowledges, likelihood of success on the merits and the balance of hardships represent the heart of a court's inquiry. *Vargas–Figueroa v. Saldana,* 826 F.2d 160, 162 (1st Cir.1987).

The court does not believe that IKON has adequately tied the payroll change initialed on October 11, to covenants signed on October 1. If anything, Schnepp's testimony establishes that the salary adjustment was not a raise related to the covenants, but a routine compensation adjustment based on sales performance over the past year. As Schnepp acknowledged, the compensation adjustment could as easily have gone down as up.

Schnepp testified that MBS had "twice yearly adjustment[s] in compensation" for Belanger and the other sales persons and that it was standard practice for "several years prior to [1996]." (Transcript at 8.) He also testified that those meeting typically occurred in six months intervals, namely, on or about April 1 and October 1 of each year. (Transcript at 9.) In addition, Schnepp testified that, after IKON acquired MBS, it continued this bi-annual system of compensation adjustment. (Transcript at 10.) Thus, it does not appear that the October 11 adjustment, which happened to be a raise this time around, was compensation for Belanger's signing the contract on October 1. If anything, Schnepp seems to have testified on cross examination that the adjustment was *not* additional compensation:

Q. The number the salary create based on the—it was based on the 12 month look back?

A. Correct.

Q. So that could have gone down for Mr. Belanger?

A. It certainly could have gone down, correct.

Q. And that's because it was based on the 12 month look back?

A. Correct.

Q. So it was not, in other words, a jump in salary for him or additional compensation, it was based on his performance, correct?

A. His performance determined his salary.

(Transcript at 19.)

 It is undisputed, however, that Belanger's continued employment was dependent upon his signing the contract. That, IKON argues, is sufficient consideration in and of itself to uphold the restrictive covenants. In support, IKON cites *Sherman v. Pfefferkorn,* 241 Mass. 468, 135 N.E. 568 (1922), in which a defendant employee executed a written employment contract containing certain temporal and geographic covenants preventing him from competing with the employer following termination. Approximately one year after he executed the contract, the employee was terminated and proceeded to work for a competitor. The court enforced the restrictive covenant, albeit with certain modifications, finding that:

the instrument was not void for lack of consideration ... [because] ... [as] reasonably construed, it contained a promise by the plaintiff thereafter to employ the defendant and by the defendant to work for the plaintiff. Nor was [the contract] open to just criticism as failing in mutuality. The plaintiff's right to discharge a defendant and the latter's

privilege of termination were on equal footing.

*Id.* at 473, 135 N.E. 568.

IKON also relies on *Economy Grocery Stores Corp. v. McMenamy*, 290 Mass. 549, 195 N.E. 747 (1935) a case in which the defendant was employed for a year before he was required to execute an employment agreement containing restrictive covenants. Although, as acknowledged by IKON, the *McMenamy* court refused to uphold the agreement because the employer had inequitably discharged the employee, it did address the merits of continued employment as adequate consideration:

> The contract was not void for lack of consideration. When accepted and acted on by the plaintiff, it implied according to its reasonable construction a promise on the part of the plaintiff to employ the defendant. It was not wanting in mutuality. The amount of compensation to be paid was fixed by separate agreement.

*Id.* at 541, 195 N.E. 747. Here too, IKON asserts, Belanger's employment, like the *McMenamy* defendant's, continued for a significant period of time after execution of the agreement, thereby demonstrating that the promise of continued employment was not illusory.

In the court's opinion, however, later decisions demonstrate that, in order for a restrictive covenant to withstand scrutiny, some additional consideration ought pass to an employee upon the execution of a post-employment agreement. While those later cases do not specifically abrogate the prior holdings, they do reflect, as IKON concedes, that some additional consideration was in fact given the employees upon acceptance of the post-employment covenants.

Moreover, these decisions require some evidence that the terms of the underlying employment contract had been negotiated.

*See Sentry Ins. v. Firnstein*, 14 Mass.App. Ct. 706, 442 N.E.2d 46, 47–48 (1982) (denying injunctive relief where defendant did not receive anything in return and signed agreement "on pain of dismissal from Century's employ"); *First Eastern Mortgage Corp. v. Gallagher*, 1994 WL 879546 (Mass.Super. July 21, 1994) (refusing to enforce restrictive covenant because employee forced to sign agreement). In *Sentry*, for example, the Massachusetts Court of Appeals reviewed a case factually similar to the instant matter and affirmed the trial court's denial of an injunction, recognizing that the non-competition agreement was imposed on the employee under "practical duress." *Sentry Insurance*, 442 N.E.2d at 47–48. At bottom, the courts now appear to refuse to enforce non-competition and non-solicitation agreements when the only purported consideration is the employee's continued employment.

While the court does not fully accept Belanger's representation that he signed the agreement "reluctantly," there is no question that the covenants in his "employment contract" were not negotiated in any respect. If anything, the evidence suggests that the clauses approximate contracts by adhesion. *See Kroeger*, 432 N.E.2d at 572. While such adhesion contracts are not unenforceable *per se*, the court must necessarily scrutinize such contracts more closely to determine whether they are unconscionable, offend public policy, or are unfair under the circumstances. *Chase Commercial Corp. v. Owen*, 32 Mass.App.Ct. 248, 588 N.E.2d 705 (1992). *See also Sentry*, 442 N.E.2d at 47 (citing Restatement (Second) of Contracts, § 188 cmt. g (1981)).[2]

It is in this regard that many of the cases cited by IKON are distinguishable. The employee-defendants had the opportunity to negotiate the terms of the restric-

---

**2.** The Restatement provides as follows: "Such contracts are scrutinized with particular care because they are often the product of unequal bargaining power and because the employee is likely to give scant attention to the hardship he may later suffer through the loss of his livelihood."

tive covenants and received specified consideration in exchange for executing the agreements. *See All Stainless*, 308 N.E.2d at 483 (restrictive covenant contained in renegotiated contract for term of employment); *Blackwell v. E.M. Helides, Jr., Inc.*, 368 Mass. 225, 331 N.E.2d 54, 56 (1975) (restrictive covenant was condition of employment and agreement was executed in advance of employment); *McFarland*, 1998 WL 136133 at *20 (defendant offered partnership in investment management firm and restrictive covenant contained in partnership agreement, a copy of which he received in advance and signed agreement "freely and willingly"). These factual circumstances are clearly inapposite to the case at bar. Here, Belanger, together with approximately nine other sales representatives, signed the agreement at what appeared to be an ad hoc meeting. Moreover, IKON concedes that it was a take-it-or-leave-it proposition.

Finally, the court does not believe that IKON, although possibly suffering some harm, will suffer irreparable harm in the absence of injunctive relief. First, IKON already had over a year's benefit from the covenants, since Belanger did not re-enter the field until January of 1999. Thus, IKON had significant time to protect its business contacts and good will, even though it claims not to have been particularly successful at replacing Belanger, Second, the case does not present such significant expense, or potential loss or use of critical proprietary and confidential information, as to auger well for preliminary relief. *Compare Marcam Corp. v. Orchard*, 885 F.Supp. 294 (D.Mass.1995); *Shipley Co., L.L.C. v. Kozlowski*, 926 F.Supp. 28, 29 (D.Mass.1996).

Third, the loss of customer good will is not necessarily irreparable. *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bishop*, 839 F.Supp. 68, 72–75 (D.Me. 1993). The possible loss of customers through improper solicitation may not constitute irreparable injury when damages

for such losses are available. *Id.* at 75 (loss of good will is frequently valued and recompensated in litigation through money damages). To the extent Belanger might disparage or lure any customers from IKON during the remaining nine months on the two year limitation—there is no evidence that he has done so to date—IKON may pursue money damages at trial. He takes that risk here. As Belanger acknowledges, IKON's loss of revenue is calculable through evidence of past earnings on the accounts and, if necessary, through the use of expert testimony. At bottom, IKON has an adequate remedy at law making injunctive relief inappropriate.

The availability of such damages also tips the balance of equities in favor of Belanger. Although the court does not accept, other than at face value, all the travails Belanger claims he will suffer if an injunction is granted, the court recognizes the severity of the impact of the loss his income at DocuSource. The court cannot say that the potential injury to IKON outweighs the harm which injunctive relief would inflict on Belanger.

Given the overriding need of the parties to have swift guidance in this matter, the court feels it unnecessary to examine the competing claims in any more depth. At bottom, while it may generally be in the public interest to "enforce agreements voluntarily entered into and accepted," *Shipley*, 926 F.Supp. at 30, the court is not convinced that, given the particular circumstances here, it is in society's best interest to preliminarily enforce the covenants at issue.

## V. CONCLUSION

For the reasons described, the court recommends that IKON's motion for a preliminary injunction be DENIED.[3]

---

**3.** The parties are advised that under the provisions of Rule 3(b) of the Rules for United

States Magistrates in the United States District Court for the District of Massachusetts, any party who objects to these findings and recommendations must file a written objection with the Clerk of this Court **within ten (10) days** of the party's receipt of this Report and Recommendation. The written objection must specifically identify the portion of the proposed findings or recommendations to which objection is made and the basis for such objection. The parties are further advised that failure to comply with this rule shall preclude further appellate review by the Court of Appeals of the District Court order entered pursuant to this Report and Recommendation. *See Keating v. Secretary of Health & Human Services,* 848 F.2d 271, 275 (1st Cir.1988); *United States v. Valencia–Copete,* 792 F.2d 4, 6 (1st Cir.1986); *Scott v. Schweiker,* 702 F.2d 13, 14 (1st Cir.1983); *United States v. Vega,* 678 F.2d 376, 378–379 (1st Cir.1982); *Park Motor Mart v. Ford Motor Co.,* 616 F.2d 603, 604 (1st Cir.1980). *See also Thomas v. Arn,* 474 U.S. 140, 154–55, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985). A party may respond to another party's objections within ten (10) days after being served with a copy thereof.