**GARBER BROS, INC., Plaintiff,**

v.

**Ismail EVLEK, Defendant.**

**No. 00 CV 5428(CBA).**

United States District Court, E.D. New York.

Sept. 29, 2000.

Nathaniel H. Akerman and Michele S. Suggs, Seyfarth, Shaw, New York City, for plaintiff.

Jeffrey Speiser, Stern & Greenberg, Roseland, New Jersey, and Edward S. Nathan, Goldman & Weintraub, P.C., New York City, for defendant.

## MEMORANDUM AND ORDER

AMON, District Judge.

### Introduction

Before the Court is Plaintiff Garber Bros., Inc.'s ("Garber") application for a preliminary injunction against its former employee, Defendant Ismail Evlek. Garber filed its Complaint and moved for a preliminary injunction by Order to Show Cause on September 11, 2000.[1] After an initial hearing on September 15, 2000, the Court issued a temporary restraining order: (1) enjoining Evlek from directly or indirectly soliciting any of Garber's customers that Evlek had any contact with during the time of his employment by Garber; (2) directing that Evlek return to Garber all of its property within his possession; and (3) directing Evlek not to attempt to recruit any Garber employees to work for his new employer, Howard Levinson Associates ("Levinson").

The Court held an evidentiary hearing on September 22, 2000, at which the defendant Evlek, Joseph Normand, a sales manager for Garber, and Marty Glick, a sales manager for Levinson, testified, and heard argument from the parties on September 26, 2000. Upon consideration of the evidence presented, the Court finds that Gar-

---

1. The Complaint states four causes of action against Evlek: (1) breach of contract; (2) misappropriation of trade secrets; (3) tortious interference with contractual and advantageous business relations; and (4) conversion.

ber has demonstrated that it is likely to succeed on the merits of its breach of contract claim and that it will suffer irreparable harm absent the relief requested. Accordingly, Garber's motion for a preliminary injunction, as modified by the Court herein, is granted.

### Findings of Fact

The following are the Court's findings of fact pursuant to Fed.R.Civ.P. 52(a):

Plaintiff Garber, a Massachusetts corporation, is a wholesale service company that services gas stations and convenience stores located in Connecticut, Maine, Maryland, Massachusetts, New Hampshire, New York, New Jersey, Rhode Island, and Virginia, and sells, among other things, tobacco, candy, groceries, and frozen foods to those stores. Cigarettes, whose prices are regulated in New York, account for 75 to 80 percent of Garber's sales volume.

Defendant Ismail Evlek was a sales representative for Garber from November 1, 1999 until September 5, 2000. Evlek's job responsibilities included ordering products for customers, dealing with customer problems, collections, and the overall maintenance and development of customer accounts. On September 6, 2000, Evlek went to work for a direct competitor of Garber's, Levinson, as a sales representative. Levinson operates in Connecticut, Massachusetts, New Jersey, New York, and Rhode Island and provides similar services and products to the same types of customers as Garber. Evlek entered into an Employee Confidentiality and Noncompetition Agreement ("Agreement") with Garber when he accepted his employment that contains three relevant restrictive covenants. First, the Agreement contains a "Confidentiality Covenant," which essentially provides that Evlek will maintain the confidentiality of Garber's proprietary information, including the "identity of all customers, vendors, suppliers and prospects and ... pricing methods and other confidential trade secrets and techniques" and return any materials containing such

information when his employment was terminated. (Agreement ¶ 1.)

Second, the Agreement contains a "Noncompetition Covenant" that prohibits Evlek from working in a business that competes with Garber for two years after the termination of his employment in "any area where any Garber customers are located and/or in which Garber now or at any time during the term of this Agreement conducts business and in any even in any geographical location within 500 miles of Stoughton, Mass." (Agreement ¶ 2.)

Finally, the Agreement contains a "Nonsolicitation Covenant," which provides that Evlek, for a period of two years after the termination of his employment, "will not directly or indirectly ... call upon, solicit, divert or take away or attempt to solicit, divert or take away, any of the customers, business, suppliers, or prospective customers, business or suppliers of Garber" and "will not solicit or discuss with any employee ... of Garber the potential employment or other engagement of such Garber employee ... by any business, firm, company, partnership, association, corporation or any other entity other than for the benefit of Garber...." (Agreement ¶ 3).

Garber provided Evlek with a week of training at its headquarters in Stoughton, Massachusetts when he first started, and thereafter was provided with on the job training by Lou Troilo, an assistant sales manager for Garber, and Joseph Normand, a sales manager for Garber and Evlek's direct supervisor. Evlek was given a sales territory that encompassed Long Island and the five boroughs of New York City and consisted of approximately 29 individual gas stations and convenience stores that had been assigned to Evlek by Garber, 16 that were part of the "Keshtgar" chain, 2 that were part of the "Zorbas" chain, and 11 independent customers.

During Evlek's tenure with Garber, Evlek developed an additional 30 gas stations and convenience stores as customers for Garber, 12 that were part of the "Erol and

Adnan" chain, 16 that were part of the "Empire" chain, and 2 independent customers. The Empire, Erol and Adnan, and Zorbas chains also conducted business with Levinson, and Garber desired to procure all of those chains' business for itself. Evlek, who is of Turkish descent, developed these customers, at least in part, because of contacts he had and acquaintances he made in the Turkish community on Long Island.

In the process of developing the Erol and Adnan and Empire chains as customers, Evlek introduced the owners of those chains to Normand. Normand assisted Evlek in developing the Erol and Adnan and Empire chains as customers for Evlek, including discussing those accounts with Evlek, having dinner with the principals of the Erol and Adnan chain and attending a meeting with the principals of the Empire chain, and helping with the merchandising of Erol and Adnan stores.

The process of developing customers for Garber is time consuming and costly as the business of supplying gas stations and convenience stores is highly competitive. For every ten prospects approached by Garber sales representatives, approximately one customer is obtained, and it takes 6 to 12 weeks to turn such a prospect into a customer. All told, Garber spends several thousand dollars to develop a customer.

In order to attract and retain customers, Garber provides a number of services to its customers. For instance, Garber sends merchandising crews to its customers to provide marketing, display, and promotional services in each gas station or convenience store, loans food services equipment, such as coffee makers and hot dog roller grills, to its customers free of charge, provides its customers with reports detailing order volumes and other business information, and runs various promotional programs that reward customers with free products, gifts, and vacations. In addition, Garber extends to its customers credit with which to make their purchases and assists customers in receiving special discounts and rebates from manufacturers.

Garber's sales representatives are the primary contact between Garber and its customers. Garber's representatives meet with its customers on a weekly basis at the customers' stores, and are often the first contact that prospective customers have with Garber. Indeed, one of a sales representative's job responsibilities is to develop new customers for Garber. In addition to paying his salary, Garber provided Evlek, as it does all of its sales representatives, with considerable support, including training them, developing and distributing to them various sales and presentation materials, assigning them established customers, and providing them with business cards, voice mail services, pagers, and hand-held scanning computers. Garber also reimbursed the expenses Evlek incurred in servicing and soliciting clients, including a car allowance of $100 a week, gas, tolls, parking, postage, telephone calls, and cellular phone calls up to $79 a week.

During the time that Evlek worked for Garber, some of Garber's customers that Evlek serviced experienced a variety of problems, including, among other things, rude deliverymen and problems with late deliveries, missing items in deliveries, and wrong deliveries. Evlek notified Garber of these problems. Although Garber may have lost some business from the Erol and Adnan chain as a result of these problems, the Court does not find that Garber's business with Erol and Adnan had diminished to the extent that Evlek suggests or that Garber had lost altogether any of its chains or independent customers.

As early as June or July of 1999, a representative from Levinson approached Evlek about accepting a position as a sales representative for Levinson. At that time, Evlek informed Normand that Levinson had offered him a salary of $75,000, plus a guaranteed bonus of $5,000, and that he was considering going to Levinson and requested from Normand a copy of his

employee agreement that he had entered into when he joined Garber. Evlek's starting salary with Garber was $37,000, which had been increased in April 2000 to $47,000. On August 7, 2000, after Evlek informed Normand he was considering going to work for Levinson, Garber increased Evlek's salary again, to $52,000.

On August 31, 2000, Evlek spoke to John Poulakis, Garber's Vice President of Sales and Normand's supervisor, about his intent to work for Levinson. Poulakis requested until Tuesday, September 5, 2000 to try and match the salary Levinson had offered Evlek. Evlek, being of the view that his salary would not be increased and that he would be let go, ultimately resigned from Garber on September 5, 2000 and began working for Levinson on September 6, 2000.

After his employment with Garber ended, Evlek, now as a Levinson sales representative, solicited some of Garber's customers for business, in particular at least seven gas stations in the Erol and Adnan chain, three gas stations in the Empire chain, and one independent station. As a result of Evlek's solicitations, a number of the Erol and Adnan stores either ceased placing orders with Garber or reduced the volumes of their orders.

### Conclusions of Law

■ A party seeking a preliminary injunction must establish that: (1) absent the relief sought, it will suffer irreparable harm and (2) either that it is likely to succeed on the merits or that there are sufficiently serious questions going to the merits to make them a fair ground for litigation, and that the balance of hardships tips decidedly in favor of the moving party. *See North Atlantic Instruments, Inc. v. Haber,* 188 F.3d 38 (2d Cir.1999). Garber has met its burden.

### I. Choice of Law

■ As an initial matter, the Court will apply Massachusetts law to the Agreement. The Agreement contains a choice of law provision selecting Massachusetts law, and in New York such a provision will be upheld provided that "(a) the law of the State selected has a 'reasonable relationship' to the Agreement and (b) the law chosen does not violate a fundamental public policy of New York." *Finucane v. Interior Constr. Corp.,* 264 A.D.2d 618, 620, 695 N.Y.S.2d 322, 324–25 (1st Dep't 1999); *see Cargill, Inc. v. Charles Kowsky Resources, Inc.,* 949 F.2d 51, 55 (2d Cir.1991).

Here, there is a "reasonable relationship" to Massachusetts, as Garber is a Massachusetts corporation with its headquarters in Stoughton, Massachusetts, the Agreement was executed in Massachusetts, and Evlek received his initial training at Garber's headquarters. *See State Chem. Mfg. Co. v. Tuckman,* No. 92 Civ. 9213, 1993 WL 43482 at *4 (S.D.N.Y. Feb.18, 1993) (considering similar factors).

■ Further, considering good will as a factor when determining whether or not to enforce a restrictive covenant does not violate a fundamental New York public policy. New York courts, like Massachusetts courts, have considered a business's good will when examining restrictive covenants in employment agreements. *See, e.g., Bdo Seidman v. Hirshberg,* 93 N.Y.2d 382, 392, 712 N.E.2d 1220, 1225, 690 N.Y.S.2d 854, 859 (1999) (discussing good will at length and noting that an employer "has a legitimate interest in preventing former employees from exploiting or appropriating the goodwill of a client and customer, which had been created and maintained at the employer's expense, to the employer's competitive detriment"); *American Inst. of Chem. Eng'rs v. Reber–Friel Co.,* 682 F.2d 382, 388 (2d Cir.1982) ("New York courts have upheld covenants prohibiting employees from soliciting former customers to the extent necessary to protect the good will of the employer.") (citing cases); *Ecolab, Inc. v. K.P. Laundry Mach., Inc.,* 656 F.Supp. 894, 899 (S.D.N.Y.1987) (considering "the goodwill of the salesman's relationship with the customer" and noting

that such "goodwill can reasonably be viewed as [a] legitimate property interest[ ] of the employer which [is] entitled to contractual protection").

Indeed, in one of the cases that Evlek cites in his Supplemental Brief in Opposition to Application for Preliminary Injunction, the New York Court of Appeals expressly stated that "a court normally will not decree specific enforcement of an employee's anticompetitive covenant unless necessary to [1] protect the trade secrets, [2] customer lists or [3] *good will of the employer's business,* or perhaps [4] when the employer is exposed to special harm because of the unique nature of the employee's services." *American Broadcasting Cos. v. Wolf,* 52 N.Y.2d 394, 403, 420 N.E.2d 363, 367, 438 N.Y.S.2d 482, 486 (1981) (emphasis and numbering added). Although many New York courts focus on the other three factors, the Court concludes that it does not violate New York public policy to consider good will. Massachusetts law therefore applies to the contract issues in this case.

## II. Likelihood of Success on the Merits

■ Under Massachusetts law, "a former employer may enforce the restrictive covenants executed by an employee when the employer demonstrates that the agreement is necessary to protect the employer's legitimate business interests and that the covenants are reasonably limited in time and space." *Modis, Inc. v. Revolution Group, Ltd.,* No. 991104, 1999 WL 1441918, at *5 (Mass.Super.Ct. Dec. 29, 1999); *Shipley Co. v. Kozlowski,* 926 F.Supp. 28, 30 (D.Mass.1996); *Marcam Corp. v. Orchard,* 885 F.Supp. 294, 298 (D.Mass.1995).

### A. Legitimate Business Interests

■ Massachusetts recognizes three legitimate business interests that may be protected by restrictive covenants: (1) trade secrets; (2) confidential data; and (3) goodwill. *See New England Canteen Serv., Inc. v. Ashley,* 372 Mass. 671, 363

N.E.2d 526, 528 (1977). Thus, while restrictive covenants cannot be utilized to restrict ordinary competition in the marketplace or to restrict an employee's using his own skills, knowledge, or talents in future employment, "the non-disclosure of confidential or proprietary corporate information and a company's good-will are legitimate business interests that a company may seek to enforce by an appropriate restrictive covenant or non-competition clause." *Modis,* 1999 WL 1441918, at *5; *see also Marine Contractors Co. v. Hurley,* 365 Mass. 280, 310 N.E.2d 915, 920 (1974) ("Such legitimate business interests might include trade secrets, other confidential information, or, particularly relevant here, the good[ ] will the employer has acquired through dealings with his customers.").

As Evlek has already returned all of Garber's proprietary and confidential information in his possession, the Court will consider only whether Garber has a protectable interest in its good will. *See New England Canteen,* 363 N.E.2d at 529 ("Where the record fails to show that the plaintiff has carried the burden of persuasion as to the existence of a valid good will interest, the plaintiff has failed to establish the threshold requirement to support a request for injunctive relief."). Good will consists of the "company's positive reputation in the community, particularly in the eyes of its customers and potential customers," *Borden & Remington Corp. v. Banisch,* No. A9901270, 1999 WL 1266161, at *3 (Mass.Super.Ct. Oct. 18, 1999), and the "relations with the corporate clients that [it] has built up," *Modis,* 1999 WL 1441918, at *8.

■ Under Massachusetts law, an employer must show at the very least that it has "generated a goodwill interest which could be harmed be denying enforcement of the covenant." *New England Canteen,* 363 N.E.2d at 528; *see also Bowne of Boston v. Levine,* No. Civ. A. 97–5789A, 1997 WL 781444, at *3 (Mass.Super.Ct. Nov. 25, 1997) (employer must establish

that its business involves goodwill and that the goodwill belongs to employer).

■ Garber has made such a showing, or at the very least has demonstrated that it will likely be able to make such a showing. Garber's business is one in which good will is undeniably important, as it is highly competitive and, because of state-regulated pricing of cigarettes, not incredibly sensitive to pricing differentials. Rather, whether or not a wholesaler like Garber or Levinson can obtain and retain business turns primarily on the service that a company provides and its reputation among its customers. This is the essence of good will.

Further, Garber has demonstrated that it has worked to develop, and indeed has developed, a significant amount of good will from its customers by, among other things, sending merchandising crews free of charge to customers to provide marketing, display, and promotional services, providing equipment, such as coffee makers and roller grills, for free, and, most importantly, supporting its sales representatives in their efforts to develop customers by offering training, providing them with a customer base, and reimbursing expenses incurred in soliciting clients. Evlek is in a position to appropriate Garber's good will because, as a sales representative, he was the primary contact between Garber and its customers and largely responsible for developing a good relationship between Garber and its customers. Although there is some evidence that Garber has had problems servicing its customers, in particular with the delivery of its products, the Court does not find that the problems were of such magnitude as to dissipate the good will that Garber had with its clients.

While the determination of whether a company actually has a protectable good will interest is made on a case-by-case basis, numerous Massachusetts courts have enforced restrictive covenants against salesmen like Evlek in similar situations. In *All Stainless Inc. v. Colby*, 364 Mass. 773, 308 N.E.2d 481 (1974), for instance, the Supreme Judicial Court of Massachusetts enforced an employment agreement entered into by a salesman. The Court stated that "Colby's work for [his former employer] All Stainless and [his new employer] Accurate involved gaining and maintaining the good will of his employer's customers in a competitive sales environment" and that "because All Stainless's principal contact with customers was through its outside salesman, the good will of All Stainless could be harmed by a former salesman's calling on an All Stainless customers, with whom he previously dealt, to solicit purchases on behalf of a new employer." *Id.* at 484.

Similarly, in *Bowne of Boston v. Levine*, the case that most fully considers the question of good will in this context, the court preliminary enjoined Ian Levine, Bowne's former salesman and vice president of sales, from soliciting business from clients and customers of Bowne's that had been assigned to him by Bowne or that he had made sales to during his time there. The court found that the corporate printing business involved goodwill, which "is generated by repeat business with existing customers or by referrals to potential customers,"[2] and that the goodwill belonged to Bowne, because it "nurtured goodwill, through the work of Levine, in the customers covered by the non-solicitation agreement," provided Levine "with an unlimited expense account to entertain clients," and had hired Levine "to use his knowledge, skill, and personality to cultivate relationships with his clients." *Bowne*, 1997 WL 781444, at *3. *See also Shipley Co. v. Clark*, 728 F.Supp. 818, 827 (D.Mass.1990) (issuing preliminary injunction against two former salesmen enjoining them from

---

**2.** Courts have declined to find good will when a business does not depend on repeat business or a product is generally sold to a customer only once. *See Folsum Funeral Serv.,* *Inc. v. Rodgers,* 6 Mass.App.Ct. 843, 372 N.E.2d 532 (1978) (funeral home); *National Hearing Ctrs. v. Avers,* 2 Mass.App.Ct. 285, 311 N.E.2d 573 (1974) (hearing aids).

working for a competitor or soliciting their former employer's customers because they might injure their former employer's good will); *Neeco, Inc. v. Computer Factory, Inc.*, Civ. A. No. 87–1921–Z, 1987 WL 16161 (D.Mass. Aug.19, 1987) (issuing preliminary injunction because former employer may "try to stop the harm to its goodwill that may come from [former sales agent's] use in her new job of knowledge of plaintiff's customers or from her prior association with them on behalf of plaintiff"); *Kroeger v. Stop & Shop Cos.*, 13 Mass.App.Ct. 310, 432 N.E.2d 566, 570 (1982) (noting in dicta that "salesmen or sales managers have the capacity to injure the goodwill of their former employers").[3]

Evlek's argument that any good will belongs to him alone because he developed customers for Garber through relationships he developed in the Turkish community on Long Island is unavailing. Garber, among other things, paid Evlek a salary in part to develop new customers for Garber, reimbursed his expenses incurred in soliciting clients, and provided him with training and sales and presentation materials to help him develop customers. Further, it appears that one factor in Evlek's hiring was his indication in his job interview that he was of Turkish descent and might be able to recruit new customers for Garber that were Turkish. Evlek also made a point of introducing Garber's sales manager, Normand, to the principals at the Erol and Adnan and Empire chains because they were potentially large customers, and relied, at least in part, on Normand's assistance to cultivate those customers.

The case *NECX v. Hirschman*, No. CA 951648B, 1995 WL 1146950, at *1 (Mass.Super.Ct. Aug. 1, 1995), is instructive. In *NECX*, the court granting a preliminary injunction enforcing a non-competition agreement, finding that the former salesman, who was admittedly contacting NECX's customers and "luring away NECX sales accounts," was damaging the good will that his former employer had developed with its customers. The NECX court noted that the "fact that some of the sales accounts have been developed by the defendant while employed by NECK makes little difference" because "[a]fter all, NECX was employing defendant Hirschman to develop such sales accounts on behalf of NECX." *Id.*

Under the facts present in this case, therefore, the Court finds that Garber has shown that it will likely succeed on the merits of its breach of contract claim, that it has a protectable good will interest in its customer relationships, and that Evlek is in a position to, and indeed appears to have already, appropriated that good will for himself and his new employer.

### B. *Peasonably Limited in Time and Space*

The Court first considers the reasonableness of the restriction that Garber seeks to enforce, which appears to be a a two-year non-solicitation provision pertaining to both customers and Garber employees, and limited to the five boroughs of New York City and Long Island. Whether or not a restriction is reasonable turns on the facts of each individual case. *See Marine Contractors*, 310 N.E.2d at 920; *see also Affinity Partners, Inc. v. Drees*, No. 952564, 1996 WL 1352635, at *4 (Mass.Super.Ct. Jan. 6, 1996) (in determining whether a covenant is reasonable, court must consider particular facts of each case, including the nature of plain-

---

**3.** *See also Browne v. Merkert Enters., Inc.*, No. Civ. A. 98–386, 1998 WL 151253, at *5 (Mass.Super.Ct. Mar. 31, 1998) (granting preliminary injunction against former vice president and business manager upon finding that food brokerage business involves good will and that the good will belonged to employer); *Fortune Personnel Consultants of Boston, Inc. v. Hagopian*, No. Civ. A. 97–24440–A, 1997 WL 796494, at *1–*3 (Mass.Super.Ct. Dec. 30, 1997) (granting preliminary injunction in a case involving a personnel recruiter who was trained by her former employer and provided various business leads, because "[t]aking a potential client who has been developed while under the employ of Fortune, certainly would constitute an invasion of Fortune's good will").

tiff's business and the character of the employment, the situation of the parties, the necessity of the restriction for the employer's protection and the employee's right to work and earn a living). "If the covenant is too broad in time, in space or in any other respect, it will be enforced only to the extent that it is severable for the purposes of enforcement." *All Stainless*, 308 N.E.2d at 485.

The Court concludes that a two-year restrictive covenant is unreasonably long given that Evlek was only employed by Garber for approximately ten months and that such period is longer than necessary for Garber to meet the risk of injury associated with his defection. *See, e.g., IKON Office Solutions, Inc. v. Belanger*, 59 F.Supp.2d 125, 129 (D.Mass.1999) (questioning whether a two-year restriction would be appropriate given that the defendant had only been employed by plaintiff for a little longer than one year); *cf. All Stainless*, 308 N.E.2d at 485 ("a brief term of employment might appropriately be a factor in determining whether to enforce a restrictive covenant in whole or in part"). Rather than declining entirely to enforce Evlek's employee agreement, however, the Court "may modify its terms so as to make it reasonable." *See Kroeger*, 432 N.E.2d at 568; *see also Fortune Personnel Consultants of Boston, Inc. v. Hagopian*, No. Civ. A. 97–24440–A, 1997 WL 796494, at *2 (Mass.Super.Ct. Dec. 30, 1997).[4] As such, the Court will modify the agreement and only enforce the restriction for a period of one year, which is sufficient for Garber "to put a new man on the job and for the new employee to have a reasonable opportunity to demonstrate his effectiveness to the customers." Harlan M. Blake, *Employee Agreements Not To Compete*, 73 Harv. L.Rev. 625, 678 (1960).

In addition, the restrictive covenant should only be enforced to the extent necessary to protect Garber's good will. *See All Stainless*, 308 N.E.2d at 486 ("Any restraint must be consistent with the protection of the good will of the employer.") Thus, the Court concludes it is reasonable to enjoin Evlek from soliciting on Levinson's behalf only those customers with whom he developed a relationship with on Garber's behalf. *See, e.g., Fortune*, 1997 WL 796494 (enforcing only the part of non-competition agreement that prohibits plaintiff from soliciting clients with whom defendant had personal dealings while employed by plaintiff); *Neeco*, 1987 WL 16161 (modifying anti-solicitation provision so as to apply only to customers with whom defendant had contact with or with whom defendant knew to be a customer of plaintiff as a result of her employment); *Modis*, 1999 WL 1441918 (enforcing non-solicitation provision limited to companies that the former employee had solicited business from for its former employer during the previous year); *Bowne*, 1997 WL 781444 (enforcing anti-solicitation provision as to customers that former employee had contact with or made sales to while employed by former employer).[5] There is

---

**4.** *See also South Nassau Control Corp. v. Innovative Control Management. Corp.*, No. 95–CV–3724, 1996 WL 496610, at *5 (E.D.N.Y. June 20, 1996) (granting preliminary injunction, but reducing length and scope of restrictive covenant and stating that "the Court may pare the areas of excess from the covenant to bring it within proper bounds"); *DataType Int'l, Inc. v. Puzia*, 797 F.Supp. 274, 285 (S.D.N.Y.1992) ("Where a restrictive covenant contains both reasonable and overbroad provisions, courts of equity may pare down the restrictions and fashion an appropriate injunction.").

**5.** *See also Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Rahn*, 73 F.Supp.2d 425 (S.D.N.Y.1999) (issuing preliminary injunction enforcing non-solicitation provision relating to clients who defendant served or solicited while employed by plaintiff); *DataType Int'l, Inc. v. Puzia*, 797 F.Supp. 274, 285 (S.D.N.Y.1992) (granting permanent injunction restricting defendant from soliciting "only those particular specific individuals with whom [defendant] has previously dealt"); *Ecolab, Inc. v. K.P. Laundry Mach., Inc.*, 656 F.Supp. 894 (E.D.N.Y.1987) (issuing preliminary injunction enforcing one-year non-solicitation provision relating to customers that defendants had serviced while em-

relatively little danger of Evlek appropriating Garber's good will with respect to customers that he had no involvement with as a Garber sales representative.

In sum, the Court concludes that a one-year restriction on Evlek's soliciting customers that he serviced as a Garber sales representative is reasonable. Evlek is not being prevented from working or earning a living. Evlek is not barred from being employed by Levinson, a direct competitor of Garber's. Indeed, Evlek is presently being paid a salary at Levinson and is not dependent on commissions. Nor is Evlek barred from using the general skills and know-how he acquired at Garber, to compete against Garber for customers. Rather, he is prevented, for only a limited period of time, from soliciting business from the customers that he serviced while employed by Garber, leaving him almost all of the more than 12,000 current Levinson customers, and innumerable potential Levinson customers, in the New York area to solicit and service on Levinson's behalf. The Court further concludes that the contract provision prohibiting Evlek from soliciting current Garber employees to work for Levinson is also reasonable.

### III. Irreparable Harm

■ Garber has sufficiently shown that it will suffer "irreparable harm" in the absence of the relief requested. Courts in Massachusetts have repeatedly held that the loss of a company's good will results in irreparable harm and is appropriately protected by an injunction. *See, e.g., Modis,* 1999 WL 1441918, at *9 (employer's interest in good will is "very difficult to quantify and [is] appropriately enforced by means of equitable relief."); *Borden,* 1999 WL 1266161, at *5 ("In this Common-

wealth, the loss of goodwill has been recognized as being particularly hard to quantify, giving rise to the need for equitable relief."); *Fortune,* 1997 WL 796494, at *3 ("damage to goodwill is likely to be irreparable in that, once it occurs, it cannot be undone and its financial implications are almost impossible to measure"); *Clark,* 728 F.Supp. at 827 ("Certainly, as to any unknown or future violations of the covenants by the defendants, [the employer's] loss of 'good will' is irreparable.").[6] *But see IKON,* 59 F.Supp.2d at 132 ("the loss of customer good will is not necessarily irreparable" since loss of revenue may be calculable).

### IV. Garber's Other Claims

As the Court concludes that Garber has demonstrated that it is likely to succeed on the merits of its breach of contract claim and that it will suffer irreparable harm absent the injunction it is seeking, the Court need not address at the present time Garber's claims for misappropriation of trade secrets, conversion, or tortious interference with contractual or business relations.

### Conclusion

For the foregoing reasons, Garber's application for a preliminary injunction is granted, but limited to a one-year period and only to the customers that Evlek was responsible for servicing during the time he was employed by Garber.

Defendant Evlek is hereby enjoined, for a period of one year beginning September 5, 2000:

(1) from directly or indirectly, calling upon, soliciting, diverting, taking away, or attempting to solicit, divert, or take

ployed by plaintiff); *Ecolab, Inc. v. Paolo,* 753 F.Supp. 1100 (E.D.N.Y.1991) (same).

**6.** New York courts have held similarly. *See, e.g., Ivy Mar Co. v. C.R. Seasons, Ltd.,* 907 F.Supp. 547, 565 (E.D.N.Y.1995) ("Numerous courts have held that harm to a company's operations, reputation, good will or customer

relations is irreparable because money damages cannot provide adequate compensation for such injuries."); *Ecolab, Inc. v. Paolo,* 753 F.Supp. 1100, 1110 (E.D.N.Y.1991) ("Loss of good will constitutes irreparable harm which cannot be compensated by money damages.").

away, any of the customers, business, and suppliers of Garber whom Evlek was responsible for servicing on behalf of Garber during the time of his employment by Garber;

(2) and from soliciting or discussing with any employee, consultant, representative, or agent of Garber the potential employment or other engagement of such Garber employee, consultant, representative, or agent by any business, firm, company, partnership, association, corporation, or any other entity, or recruiting, hiring, or engaging or attempting to recruit, hire, or engage such employee, consultant, representative, or agent.

SO ORDERED.